THE PEOPLE, on the relation of Davies, *against* COWLES.

Where the office of a justice of the supreme court becomes vacant before the expiration of his term of office, the vacancy is to be supplied by the electors of the judicial district in which it exists, at the next general election of judges, although the vacancy occur at so late a day that no notice is or can be given by the secretary of state or other officer pursuant to the statute, that a justice is to be elected at such election to fill the vacancy.

Accordingly, where the incumbent, whose term of office would not have expired for several years, died on the 23d of October, and the electors of the district at the general election of judges on the ensuing 6th of November

elected a person to fill the vacancy; *Held*, that the election was valid, notwithstanding no notice was given by the secretary of state that a justice was to be elected to fill the vacancy at the election.

Action in the nature of a *quo warranto*, brought by the attorney-general in the name of the people upon the relation of Henry E. Davies against Edward P. Cowles. The action was in the supreme court and was commenced on the 7th of December, 1855. The complaint stated, that at the general election held in the 1st judicial district in November, 1852, Robert H. Morris was elected a justice of the supreme court for the term of eight years, from the 1st day of January, 1853; that on the day last named he entered upon and continued to discharge the duties of a justice of the supreme court until the 23d day of October, 1855, when he died; and that his death was immediately thereafter publicly made known within and throughout the city and county of New-York, which composed the 1st judicial district; that a general election of judges throughout the State of New-York, pursuant to the constitution and laws thereof, was held on Tuesday, the 6th day of November, in the year 1855, for the election, among other officers, of justices of the supreme court; and that in the 1st judicial district, there was one justice to be elected in the place of a justice of such court whose term of office would expire on the 31st day of December then next, and one to be elected, if the same could be lawfully done, in the place of and to fill the vacancy occasioned by the death of said Morris, which vacancy was existing and had not been filled on the day of election; that the secretary of state had given notice of the election, and that at the same time a justice of the supreme court was to be elected in the place of the justice whose term of office would expire on the ensuing 31st day of December; but that no notice was given by him or any officer, state or local, that at such election a justice was to be elected in place of and to fill the vacancy occasioned by the death of Judge Morris. The complaint further stated,

that as early as the 1st of October, 1855, the various political parties in the city and county of New-York had nominated persons as candidates for the several judicial offices to be filled at the said general election, where the term of the incumbents would expire on the ensuing 31st of December, which nominations were made through conventions of delegates; and that after the death of Judge Morris and before the election, such conventions respectively reassembled, and each nominated a candidate to be voted for at the election to fill the vacancy caused by such death. Such nominations were as follows, viz: Charles A. Peabody was nominated on the 30th of October, William H. Leonard on the 1st, Henry Hilton on the 2d, and Henry E. Davies on the 3d day of November; and that such nominations were published and made known throughout the 1st judicial district. The complaint further averred, that at such election ballots were cast by electors of the 1st judicial district for justices of the supreme court in the following form: "For Justices of the Supreme Court for the First Judicial District, Edward P. Cowles, long term, eight years; Henry E. Davies, short term, to fill a vacancy; James R. Whiting, long term, eight years; Henry Hilton, short term, to fill a vacancy; William H. Leonard, short term, to fill a vacancy; Charles A. Peabody, short term, to fill a vacancy." That for said long term of eight years, the votes given at the election were 55,769; of which said Cowles received 26,613, said Whiting received 28,813, James T. Brady received 343; and that said Whiting was at such election duly elected a justice of the supreme court for the term of eight years, from the 1st day of January thereafter; that at such election there were given for such short term to fill a vacancy, 49,848 votes; of which said Davies, the relator, received 17,996, said Hilton, 15,526, said Leonard, 9,933, said Peabody, 5,782, and several hundred were given for other candidates; and that thereupon the relator subscribed and took the oath of office prescribed to be taken by a justice

of the supreme court and deposited the same in the office of the secretary of state. It was further stated, in the complaint, that on the 3d day of December, 1855, the governor of the state, in due form of law, appointed the defendant a justice of the supreme court to fill the vacancy occasioned by the death of Judge Morris, and that the defendant thereupon subscribed and took the oath of office and deposited the same in the office of the secretary of state; but the plaintiff alleged that such appointment by the governor was not in accordance with or authorized by the laws or constitution of the state. It was also averred in the complaint, that at the said election the greatest number of votes given by electors for any person to fill the vacancy created by the death of Judge Morris, were given for the relator to fill such vacancy; and that he became and was, on the 7th of November, and thence has been a justice of the supreme court and entitled to perform the duties and enjoy the emoluments of such office. That the defendant, without legal right, warrant or authority, had, since the 3d of December, usurped and unlawfully held and exercised the said office. The complaint prayed that the court adjudge that the defendant unlawfully holds and exercises the office of justice of the supreme court, and that he be ousted and removed therefrom; and that it be adjudged that the relator is and has been entitled to the same since the month of November.

The defendant demurred to the complaint, assigning the following grounds: First. The complaint does not set forth facts sufficient to constitute a cause of action, in this, to wit: 1. By the facts alleged, it was not competent, under the constitution and laws of this state, for the electors of the 1st judicial district, or any of them, at the general election, held on the 6th November, 1855, to fill by election the vacancy caused by the death of Robert H. Morris; 2. Under the aforesaid constitution and laws, all votes given for the said Henry E. Davies at such election, as

alleged in the complaint, were void, and did not operate to confer any right to fill such vacancy upon the said Henry E. Davies, or confer upon him the office of a justice of the supreme court. Second. By the said complaint, it affirmatively appears that the defendant has been legally appointed by the governor of the State of New-York to fill the vacancy caused by the death of the said Robert H. Morris, and is now legally holding such office, and entitled to hold the same until the same shall be filled by election at the general election in November, 1857, and until the 31st day of December thereafter.

The cause was heard at special term in the city of New-York, and judgment rendered, adjudging that the defendant had not usurped or intruded into the office, and that by virtue of the appointment by the governor he was entitled to hold such office and perform its duties until the 31st day of December, 1857. On appeal, the supreme court at a general term in the 1st district, modified the judgment by adding thereto a provision that the defendant was entitled to exercise the office until the 31st of December, 1857, unless the vacancy caused by the death of Judge Morris should be before that time filled by an election, to be held according to law; and with this modification, the judgment at special term was affirmed. The plaintiff appealed to this court.

*N. Hill, Jr.*, for the appellant.

*Chs. O'Conor*, for the respondent.

JOHNSON, J. On the 23d of October last, Robert H. Morris, one of the justices of the supreme court, elected in the 1st judicial district, died, leaving unexpired five years and upwards of the official judicial term for which he was elected. At the general election held on the 6th day of November last, a large number of the electors in that dis-

trict voted for a justice of the supreme court to fill a vacancy, and of the votes so cast, Henry E. Davies received a largei number than any other person so voted for. No notice was given prior to the election, by the secretary of state, or by any other officer, that any vacancy in the office of justice of the supreme court was to be filled in the 1st judicial district at that election. On the 3d of December last, the governor appointed the defendant to be a justice of the supreme court, to fill the vacancy occasioned by the death of Mr. Justice Morris. These facts, which appear upon the face of the complaint, and are admitted by the demurrer, sufficiently present the question now before us, which is, whether the electors of the 1st judicial district, under the circumstances stated, possessed the power of filling the vacancy in question by their votes at the last general election.

Section 13 of article 6 of the constitution is in the following terms : " In case the office of any judge of the court of appeals, or justice of the supreme court, shall become vacant before the expiration of the regular term for which he was elected, the vacancy may be filled, by appointment by the governor, until it shall be supplied at the next general election of judges, when it shall be filled by election for the residue of the unexpired term."

This is the only section which, in direct terms, speaks of a vacancy occurring in either of the offices named ; and as the vacancy in question occurred before the expiration of the regular term of the officer by whose death it was occasioned, a case is presented clearly falling within the scope of the section.

It is contended that the whole purpose of this section is to confer a power of appointment upon the governor, and limit the period for which such appointment shall be made, and that the section does not regulate the filling of the vacancy by election. To shape the language used so that it can bear this construction, it is necessary to subject it to great and violent changes. Thus altered, it will read, "the

vacancy may be filled, by appointment by the governor, until it shall be supplied at the next general election of judges, *at which* it *can* be filled by election (after such notice as may be provided by law) for the residue of the unexpired term." Thus read, it does not conflict with the decision appealed from. But it is difficult to conceive that if this was what the convention meant, they would have used the language they have, to convey that meaning. The books will be searched in vain for authority or principle to support such a reading. The language, as it stands, provides for a temporary filling of the vacancy by the governor, and a permanent filling of it by the electors, and quite as plainly for the one case as for the other. It is clear and explicit, and neither requires nor permits any other construction than that which is obvious upon its face.

When such a vacancy is to be permanently filled, it must be "by election for the residue of the unexpired term," not at a special election, nor at a general election merely, but at a "general election of judges." Other clauses of the same article afford us the means of saying what was referred to under this designation. Under § 2, the four elected judges of the court of appeals are directed to be so classified that one of them shall be elected ever second year; and by § 4, the justices of the supreme court are to be classified so that one of the justices of each district shall go out of office at the end of every two years. One judge of the court of appeals and eight justices of the supreme court would thus end their official terms at the close of every second year. An election to fill these places is plainly the general election of judges spoken of in the 13th section. Section 12 of the same article provides that "the judges of the court of appeals shall be elected by the electors of the state, and the justices of the supreme court by the electors of the several judicial districts, at such times as may be prescribed by law." Under this section the legislature had power to fix a different time, for the election of the officers named, from

The People *against* Cowles.

that at which the governor and members of the legislature were to be elected, but they have not hitherto deemed it expedient to do so. Under the provisions of chapter 240 of the Laws of 1847, § 3, those officers are to be chosen at general elections, which are declared to be such as are held at the same time in every county for the election of all or some of certain designated public officers, among whom are named judges of the court of appeals and justices of the supreme court. Section 6 of the same act provides " that all vacancies in any of the offices named" in the last mentioned section, with certain exceptions unnecessary to be noticed, " shall be supplied at the general election next succeeding the happening thereof." By this enactment the legislature have exercised the power which it is claimed they possess, under article 10, § 5 of the constitution, to provide for filling vacancies in office. It applies to justices of the supreme court and to judges of the court of appeals. It happens in the case before us that the election which was held on the 6th of November last was not only a general election, but also a general election of judges. There was, therefore, the warrant both of the constitution and the statute for the electors to proceed to fill the vacancy, if that election was the " next" after the occurrence of the vacancy. I abstain from quoting dictionaries to show how "next" is defined ; no plainer term can be used. The election on the 6th of November was certainly the first that occurred after the 23d of October, when the vacancy took place, and it as certainly occurred after that day, unless the position taken by the defendant's counsel shall be sustained. That position was, that the term " next general election" was to be held to embrace not only the actual day on which the voting takes place, but also the preceding period in which the preliminary notices are by law to be given by the secretary of state, where such notices are directed. If this be so, then as to some officers the election begins on the 1st day of September at latest, and as to others on the 15th day of October

3 KERN.—23

(1 *R. S.*, 4*th ed.*, 339, 340, §§ 2, 4.) Moreover, the sec
tions of the statute which direct the secretary of state to
give notice and prescribe its terms, recognize the position
that the day of election, and not the whole period between
it and the last day of notice, is designated by the phrase
" next general election." His notice is itself to specify the
officers to be chosen " at the then next general election."
( *Laws of* 1847, *ch.* 240, § 7 ; 1 *R. S.*, 4*th ed.*, 339, §§ 2, 3, 4.)
A further and conclusive answer to the position is to be
found in the well ascertained meaning of the terms " gene-
ral election." The election law of 1842 (*ch.* 130, §§ 4, 5)
says, general elections shall be held on the " Tuesday suc-
ceeding the first Monday of November in every year ; and
again, " general elections shall be held for one day only."
This expression, which is also found in the Revised Statutes,
had been long used in this state before the convention
which framed the constitution met ; it was then in force as
law, and must be taken to have been used by that body in
this, which is both its natural and its accustomed sense. It
seems to me, therefore, that we are bound to declare that
the election at which the relator claims to have been elected
was the next general election of judges after the office in
question became vacant. Nor does it seem to me that the
necessity of this conclusion is at all affected by the fact that
the election law (1 *R. S.*, 4*th ed.*, 340, § 4) contains a provi-
sion under which, if this vacancy had existed prior to the 15th
of October, it would have been the duty of the secretary of
state to give notice of the vacancy. Having occurred after
that period, no similar duty was by law imposed upon him,
or upon any other officer. In the case of a vacancy occur-
ring in the office of a judge of this court, no law makes it
the duty of any officer under any circumstances to give
notice of the vacancy with reference to an election to fill it.
And yet the statute before referred to ( *Laws of* 1847, *ch.* 240,
§ 6) directs it to be filled at the next election ; and
§ 10 of the same act, regulates the form of ballots to be

The People *against* Cowles.

given when at a general election one or more vacancies are to be supplied in the office of judge of the court of appeals or justice of the supreme court. Nor is this provision necessarily to be regarded as proving that an accidental omission exists in respect to the filling of the office of a judge of the court of appeals, as to which a notice was at least as proper as in regard to filling the office of a justice of the supreme court. That supposition ought not to be resorted to, except from necessity, because it assumes that the legislature has been guilty of an oversight in the discharge of their duty. The better explanation is that afforded by the fact that the section requiring notice when a vacancy in a district is to be filled, formed part of the election law under the Revised Statutes. At that time there were senatorial districts and congressional districts, each of which fell under its provisions. This section was continued in the revision of the election law of 1847, and it was probably allowed to stand unaltered, as the legislature saw that under it no conflict could arise with § 6 of that act, which provides for filling vacancies in the offices of judges of the court of appeals and justices of the supreme court and others at the next general election; inasmuch as when the vacancy in the office of justice of the supreme court occurred before October 15th, notice could be given, and when it occurred after that time, no law prescribed any notice. This they might reasonably consider good ground for not altering the section in question; because, even where notice is prescribed, no one supposes that the omission to give it will vitiate the election.

Having arrived at the conclusion that the constitution requires the interpretation above given upon the plain meaning of the terms employed, it may be proper to consider for a moment a ground which seems to have pressed with controlling force upon the judges of the supreme court who decided the case at general term; I mean the possible inconveniences which may grow out of the provision as it stands, upon the interpretation we have

put upon it, and which we think its language clearly requires The period has been when an inconvenience which would arise from construing a statute as it stood and as it read, was deemed abundantly to warrant a court to put upon it a strained and unnatural construction, for the purpose of avoiding the inconvenience and substantially conforming the will of the law-makers to the better judgment of the judges. But courts at the present day, both in this country and in England, acknowledge that their simple duty is to strive to ascertain the will of the law-makers from the law itself, and having ascertained it, to give it effect. Courts are not responsible that only wise laws shall be made; they have no power given to them to judge of the wisdom of the legislature, nor to revise and alter that which has been enacted to be the law. ( *Waller* v. *Harris*, 20 *Wend.*, 561; *Vilas* v. *Jones*, 1 *Coms.*, 274; *Leith* v. *Irvine*, 1 *My. & Ke.*, 277.) If these principles are proper to restrain the action of courts in construing acts of the legislature, they certainly, with no less cogency, are applicable to constitutional provisions, which, from their greater importance and more permanent operation, must be supposed to have been framed with the utmost circumspection. Upon the construction which we put upon the constitution and laws, the vacancy occasioned by the death of Mr. Justice Morris was proper to be filled by election at the time when the relator claims to have been chosen. Having arrived at this conclusion from the consideration solely of the language of the constitution and the laws, it is gratifying to find, though we do not advert to it as a ground of decision, that the history of the constitutional provision in question, as preserved in the debates of the convention, coincides exactly with the interpretation which its terms impose upon us. Section 13 happens to stand in the very terms in which it was introduced before the convention. Mr. Loomis, on introducing the section, is reported to have said : " It must be obvious that no provision was made for filling a vacancy. He had therefore drawn a

section to provide for supplying vacancies," which he read in the words as it now stands. Mr. Tallmadge moved to amend, by striking out the words, " it shall be supplied at," so as to make it imperative to elect a successor at the next general election, and deprive the governor of the power to fill by default. Mr. Loomis explained his object to be to keep the office filled until the votes were counted and the elected judge installed. Mr. Tallmadge withdrew his amendment. After some other propositions, which throw no further light upon the point, Mr. Loomis' amendment was agreed to. (*Conv. Debates, Argus ed.*, 596.)

We are of opinion that the judgment should be reversed, and leave be given to the defendant to answer.

DENIO, C. J., COMSTOCK, SELDEN and HUBBARD, JJ., concurred in the foregoing opinion.

WRIGHT, J. (Dissenting.) Thirteen days prior to that designated by law for holding what is called in the constitution the " general election of judges," Justice Morris, of the 1st judicial district, died, creating a vacancy in the office. No official notice was given that the vacancy existed, or that the people were required to fill it by election. The relator claims to be entitled to the office, on the ground that at the election, on the 6th November, held for the choice of state, district and county officers, 49,848 electors of the city and county of New-York deposited in the ballot boxes of the different election districts, a ballot or vote for " Justice of the Supreme Court, short term, to fill a vacancy," of which votes so cast the relator received a plurality. His right to the office rests exclusively on the ground that at such election, a plurality of those electors of the district choosing to designate upon the judiciary ticket some person to fill a vacancy, designated the relator. The single question is, does this designation, by a plurality of the electors making it, (without notice of a vacancy from

the secretary of state, or any state or local officer, or that such vacancy was to be filled), entitle him to hold and exercise the office for the residue of the unexpired term of Judge Morris?

It is urged that as a vacancy existed, the constitutional time for filling it by election was on the 6th November, that being the day fixed for the next general election of judges, after the occurrence of the vacancy; that the day or time being fixed by law for electing judges generally, irrespective of the question whether there were vacancies to be filled or not, when that day arrived—if a vacancy had previously occurred—the constitution authorized and directed the people to fill it; and the right being left unqualified and unconditional by the fundamental law, its nature could not be changed by legislation. In other words, a vacancy having occurred before the time fixed for voting for judges throughout the state, those electors of a judicial district, whether one or more, having knowledge that a vacancy exists, may by merely casting their ballots for a particular person, elect such person for the residue of the unexpired term of the former incumbent, thus, irrespective of and beyond any legislative regulation, and indeed in restraint of it, holding an election to fill the vacancy under and by force of a constitutional provision. This right is assumed to be given, and the duty enjoined by the 13th section of the 6th article of the constitution of 1846. I cannot read the section as imperatively commanding a vacancy to be filled by the people at the next day designated by the legislature for a general balloting for judges succeeding the vacancy; nor if it be not filled then, by election, that it cannot be at all, but must remain vacant. To this latter conclusion we must come, if the relator's interpretation of the section be correct, for by such interpretation the people being only able to fill it, and at an election next succeeding the vacancy, and the appointing power being exhausted, should there be a failure from any cause to elect at that

time, the vacancy must continue ; thus defeating the end contemplated by the constitution, and for aught that I can perceive, tending to a subversion of the judicial branch of the government. One construction, therefore, involves consequences vastly more important than any growing out of the mere fact whether the relator or the defendant shall enjoy the office.

I agree that in interpreting the constitution, we are to understand the words of the instrument in the natural sense. No distorted signification is to be given to them, with the view of construing an intention of the framers and the people who adopted it, inconsistent with that obvious from the words of the instrument. This, however, is but one rule of the construction applicable to a written instrument, whether it be a constitution of government, a statute, or an agreement between parties. That to be interpreted is the intention of the framers, the makers or the parties. When the words employed in a constitution are susceptible of a double signification, and do not embody an absolutely certain and definite meaning, they are to be interpreted in a sense consistent with, and that will uphold the end to be effected. We are not (unless it be unavoidable) to give to the words such a meaning as may defeat the object apparent on the face of the instrument, and involve the authors in an absurdity. More especially is this to be avoided when the words employed may be understood in their natural sense, and the instrument so read as to uphold the object contemplated, and give consistency of intention to the framers, avoiding any absurd results. So, also, the words are not to be construed so as to produce conflict or contradiction between different parts of the instrument ; but we are to surround ourselves by the same circumstances that surrounded the framers of the instrument, look primarily to the object in view, follow them in their successive steps, indicated by the instrument, to the attainment of that object, and not by giving, perhaps an absolute meaning to a

sentence or part of the writing, whilst separating it from the context, render the instrument as a whole, incongruous, and the system devised impracticable, an l containing within itself the elements of its destruction. Moreover, it is not unimportant in this case to keep in view the kind and nature of the instrument to be interpreted. The relator claims the office, for the reason, as his counsel affirms, that the constitution enjoined and directed the people to fill the vacancy; but is a constitution of government ever mandatory on the people, or does it ever contain within itself the means for its own execution? Irrespective of statute law, can there be such a thing as an election under the constitution? Should the legislature omit to provide for an election, or the manner of conducting it, would the simultaneous assembling of the people and voting, be a valid election, even though the constitution designated a time to hold it? I had always supposed that it was the office of a statute to define and prescribe rights and duties; to afford remedies by which those rights might be secured and enforced and redress afforded, and to provide for carrying on the government. Statutes are the vital forces upon the foundation and within the general frame work of the organic law. In theory, a constitution never does or can command the people to do anything. It emanates from the people and may be mandatory upon those to whom they have delegated a part of their sovereignty, but never upon themselves. A written constitution is a popular declaration, in abstract form, of fundamental rights; a partition or distribution of delegated, legislative, executive and judicial power, and a limitation of and restriction upon the exercise of such power. This is all. It enforces nothing, nor does it contain within itself the elements of active enforcement. It speaks to the legislature in words of limitation and restriction. It invokes the judiciary to keep the law-making power within its restricted limits. It is, itself, ever passive.

Guided by these rules, we may examine the constitutional question, without the chance ourselves of running into an absurd conclusion, which we would be apt to do by narrowing our duty solely to the construction of the 13th section and reading it in the way urged by the relator. We may avoid the danger of interpreting the intention of the framers, solely by the meaning we shall give to a few words of the instrument, separated from the context.

The 6th article of the constitution is devoted to the organization of the judicial branch of the government. Prior to 1846, the system of an elective judiciary, in this state, was untried; but a popular election of other officers had long existed and had been a subject of exclusive legislative regulation. The convention found the subject of popular election regulated by law, and it is to be assumed that the term "election," when used in the constitution, has reference to the thing so called existing at the period of its adoption. The policy of electing judges and limiting the tenure of the office, received the favor of the constitutional convention of 1846, and it was determined to enter on the experiment of an elective judiciary. The system of popular election, as the mode of choice, being adopted, the next labor of the convention was to frame a scheme to effect the end. Provision was made for a court of *dernier* resort, consisting of eight judges, and dividing the state into eight judicial districts, with four justices of the supreme court in each district. The tenure of office of judges of the court of appeals and justices of the supreme court was fixed at eight years. The judges of the court of appeals and justices of the supreme court, first chosen, were to be classified so that their respective terms of office would expire at the end of two, four, six and eight years from the 1st of January, 1848. This necessarily contemplated that a judge of the court of appeals and one justice of the supreme court in each of the eight judicial districts of the state would be chosen biennially; and this is what is styled in the constitution " a gen-

eral election of judges." It was the time to be prescribed by the legislature for a choice throughout the state of a judge of the court of appeals and a justice of the supreme court in each of the judicial districts. But it is apparent from the article, that the convention did not intend to prescribe the time or requisites of an election, but only to declare the mode of choice, leaving to the legislature the duty of regulating the former. The paramount intention, evident from the instrument, was to go no further than to sanction and adopt the mode of selecting judges by a popular vote rather than by appointment. Accordingly, after organizing the courts, fixing periods within which the legislature should provide for initiating the system, and providing for the judicial classification, the 12th section of the 6th article devolves upon the legislature the whole duty of prescribing the time and manner, when and in what way the electors of the state or district shall indicate their choice. Justices of the supreme court were to be elected by the electors of the several judicial districts at such times as might be prescribed by law. (*Const.*, *art.* 6, § 12.) This is the only injunction of the constitution respecting the mode of choice, and applies to all cases, whether the office be vacant or the term of the incumbent expires by constitutional limitation. It was quite unnecessary that any further constitutional provision should be made for subjecting the choice to fill a vacancy to the popular vote. The whole subject as to the mode of choice was exhausted by the 12th section. But a popular general election occurred only annually and by force of constitutional provisions such general election for judges would occur in the order of time only biennially; it was therefore to be foreseen that vacancies might occur in the judicial office at times when they could not be filled in the mode prescribed by the constitution, viz., popular election; and possibly, from this cause, the system might be crippled or entirely subverted. The framers of the constitution were providing a judicial force

to meet the public exigencies, none of which could be spared without public injury and a disarrangement of the system. It was entirely impracticable to provide for assembling the electors to vote upon the occurrence of a vacancy.   Hence they provided for an appointment by the governor, until the people could have an opportunity of indicating their choice when a judicial election should be held.   This is the subject matter of the 13th section of the 6th article.   The section relates to filling vacancies by appointment.   It confers the power of appointment on the governor in the contingency of a vacancy intermediate the biennial election of judges; and this, obviously, from the context, was the only purpose of inserting the section.   But it is said that the words employed express something more, and though the single intention be apparent we must give effect to every word.   Should courts, seeking only for the intention of its framers, deal thus hypercritically with the fundamental law of the state ? The section is not constructed with singular aptness, cl perhaps strict adherence to grammatical rules; but keeping in view that the instrument had already designated the mode of choice in all cases, and not losing sight of the single subject matter of the section, the intent and meaning of its framers, it seems to me, cannot be mistaken.   The section reads : " In case the office of any judge of the court of appeals or justice of the supreme court shall become vacant before the expiration of the regular term for which he was elected, the vacancy may be filled by appointment by the governor, until it shall be supplied at the next general election of judges, when it shall be filled by election for the residue of the unexpired term."   Is this anything more than conferring the power of appointment, in case of a vacancy, until the office can be filled by election, at the time and in the manner prescribed by law?   Is it anything more than designating the chief executive officer of the state to supply the place by appointment until the electors should indicate their choice, by a vote, of a person to fill the vacancy ?   I

think it is but declaring that a vacancy occurring interme-
diate the general election of judges may be filled by
appointment; to which the injunction of the 12th section,
as to the mode of choice, is superadded. The clause, "when
it shall be filled by election for the residue of the unexpired
term," was obviously not intended as a constitutional injunc-
tion as to the specific day or time when a vacancy should
be filled by the popular vote. This would involve the ab-
surdity of granting to the legislature the power, in all cases,
of prescribing the times of election, and in the 13th section
divesting them of the power in case of a vacancy. It will
not be questioned that if the section means that the electors
are to meet to fill a vacancy, on a fixed day, viz., the next
day in order of time in which judges are to be chosen
throughout the state, that the legislature is stripped of all
power to fix the time of such election or to regulate it;
and though given in the 12th, it is taken away in the succeed-
ing section. It cannot be pretended that the legislative
power under the 12th section is exhausted, when a day has
been fixed for balloting for judges throughout the state, and
that designating that day they have no further control or
power over the subject in case of a vacancy. If so, a va-
cancy is to be filled at an election held under the constitu-
tion, and not at the time or in the manner prescribed by
the legislature. Whilst an election is being held, pursuant
to a statute to elect judges for the regular term, another
may be progressing under a constitutional provision to fill a
vacancy. This would be certainly a novel office of the
organic law. But this is not all. As the relator would
have the section read, it contains a command to the people
to fill the vacancy at the next general election succeeding
its occurrence, and the legislature cannot, in this respect,
exercise any control. The constitution fixes the time unal-
terably. It must be done then or not at all. If the consti-
tutional day be allowed to pass, the power is gone forever,
even from the electors themselves. Should there be a fail-

ure to fill the vacancy, either from a tie vote or for any other cause, there is no power subsequently to fill it, and the appointing power of the governor terminating at the close of election day, for anything I can see, the vacancy must remain unfilled for the residue of the unexpired term. This is the length to which the construction of the relator tends. In this case had not some of the electors, of their own volition, cast their ballots for the relator, or some other person, the residue of the unexpired term of Judge Morris must have remained unfilled; and indeed if the relator's construction of the section be the true one, this may still be the case. Adopting his construction, there were two vacancies to fill in the 1st judicial district, at the November election, and the votes cast for him would be void for uncertain designation. It will not do to say that in case of a failure to elect at the next election day succeeding the vacancy, the office is to remain vacant but for two years, and that at the end thereof the electors may try again. This would be interpolating words in the section to the horror of the strict verbal constructionist, whilst it would destroy the relation claimed by the relator for the word " *next,*" used in the section. Besides, if words may be interpolated to relieve from an absurd result, they may be to avoid it. Thus, construing the section as an imperative command to fill the vacancy, by election, at the next general election day after its occur rence, and at no other time, the end contemplated by the framers of the constitution is defeated, the entire judicial system disarranged, and, by possibility, practically, this branch of the government subverted. We are not to assume that the framers of the instrument intended such a result, but on the contrary, if it can be done, give such a sense to the words employed in a part of the instrument as shall harmonize with the object to be attained, and promote instead of subverting that object. It is not to be assumed that the convention in constructing a judicial system intentionally planted in it the seeds of its own subversion:

more especially are we to avoid this, when without placing a palpably unnatural meaning upon words, or imputing ignorance of the force of language, we may read the instrument, so as to uphold the object to be attained, and harmonize it in all its parts, attributing no folly to its framers. I am not disposed to favor any latitudinarian construction of the constitution; but I am still less inclined to carp about the peculiar meaning of words, and the philological construction of a sentence, when it may be read, without great violence to language, as upholding an intention obvious from the whole instrument. Nor are we to assume that the convention did not foresee that vacancies might occur under circumstances rendering it impossible for the body of the electors of the state or district to have notice thereof, but foreseeing this, they chose, in the elective system they were framing, contrary to its general policy, to have vacancies filled, not by all the qualified electors of the state or district who might choose to vote, but by those only of a particular neighborhood or town, who should chance to ascertain the fact that a vacancy existed. We are told that the power to appoint is limited to cases of overruling public necessity, and ends as soon as the people next meet. That the appointing power is limited to cases of public necessity is not denied, but public necessity, also, as the convention must have foreseen, as imperiously demanded that the electors, who were to indicate their choice by a ballot, should have knowledge that a vacancy existed. The relator construes the language of the section as importing an intention by the framers of the constitution to have vacancies in the judicial office filled, not by the body of the electors, but by those who might chance to hear, prior to election day, that a vacancy existed; consequently, carrying out the construction to its legitimate end, a judge of the court of appeals or justice of the supreme court might be elected by the single vote of an elector, the vacancy occurring by the death of the incumbent but a day

previous to the election, and being unknown to all other of
the electors of the state or district that were required to
fill it.   Nay, more, if a vacancy actually existed, but was
unknown to all of the electors, and the constitutional time
for filling it had passed, it cannot be filled, subsequently,
either by election or appointment.   Shall we struggle to
give a construction to a single sentence of the instrument,
wrenched from its context, out of which these absurd con-
sequences must inevitably flow?

But I deem it unnecessary to distort the meaning of any
of the words in the 13th section, to give a construction to
the section widely different from that claimed by the rela-
tor.   I shall assume that, in the aggregate, the convention
was composed of sensible, foreseeing men.   No violence
will be done to the language by making the section express
a harmonious and consistent intent, without any absurdity
or folly to be attributed to its authors or the people who
adopted it.   It is a rule, to construe a pleading most strongly
against the pleader; but I am not inclined to impute such
a meaning to a word or two, in a particular section of a
written constitution, as shall call for the inference of an
intention of its framers antagonistical to that manifest from
the whole instrument.   The obvious intent of the 13th
section as a part of the general scheme was, to provide for
filling vacancies in the judicial ranks, not to make them;
and we are not required to infer that the latter purpose was
the one intended.   I regard the question as one more of
*emphasis* of words, than of grammatical arrangement, or sig-
nification of the words themselves.   They may be read as
importing an absolute command or otherwise.   As the sub-
ject matter of the section is the filling by appointment, the
latter is the most natural sense, and it may be read in this
way.   " The vacancy may be filled *by appointment* by the
governor until it shall be supplied at the next general elec-
tion of judges, *when,* or *at which* it shall be filled *by election,*"
&c.; read thus, it contains no mandate.   The appointment

is made to terminate whenever the vacancy is actually supplied by election, and not before. It is not limited to the next general election of judges merely, but to the next general election, " when the office shall be filled by election." The section contemplates that it shall be supplied by election at the next general election of judges ; not absolutely the next voting day in order of time succeeding the vacancy, but at the next general election of judges held pursuant to law. When the people have an opportunity to vote at a legal election, they shall fill the vacancy ; but until it is thus supplied, it shall be filled by appointment, so that the office may never be vacant. This seems to me to be the plain, natural and sensible construction of the section. It is admitted that there would be no difficulty in the way, if the words " held pursuant to law," were added after the word " election" in the latter clause of the section, so that it would read " when it shall be filled by election held pursuant to law," &c. But the convention used the term " election" in no arbitrary sense, but as importing a thing created and existing by law ; and are not therefore the words " held pursuant to law" as much incorporated in the section, as though written down by its framers ? Giving the interpretation that I do to the section, whilst it does not change the signification of the words, it is in harmony with other parts and provisions of the instrument, and secures rather than subverts the general purpose obviously declared by the 6th article. It involves its authors in no labyrinth of absurdity. It leaves the .egislature free to regulate the time and mode of election in all cases, and does not abridge them of the power to prescribe by law for supplying vacancies, and keeping up the judicial force, until vacancies for the unexpired terms are filled by election in the regular mode. Instead of being a mandate to the people or the legislature, it is merely a limitation or description of the time when the appointee's office shall terminate.

It is not contended by the relator that he has any right to the office, unless his interpreta.ion of the 13th section be the correct one. He reposes himself upon the ground that the constitution contains a positive direction as to the time when vacancies shall be filled, and that it would be an infringement of the instrument, to restrict the right of the elector, by legislative enactment, to a particular kind of vacancies, viz, such as had occurred twenty days before, or of which the secretary of state, and other officers of government have actually notified the people. He takes the unqualified position that the section is a restriction upon legislative authority, and that no statute can be enacted which shall interfere with the constitutional privilege or right of the elector, when a vacancy occurs prior to the day fixed for voting for judges throughout the state, to cast his ballot for a person to fill the vacancy. By his construction, the election to fill the vacancy, is one held not pursuant to any statute, but an unregulated assemblage of the electors under a constitutional provision. It is urged that it is not strictly correct to say that the election to fill the vacancy is held under the constitution, as the legislature provides the machinery, and the constitution only fixes the time. But is it true that anything is provided by statue? A popular election is being held, for the choice of other officers, regulated and conducted according to law, but not to fill a vacancy in the judicial office. The elector may embrace the occasion to deposit his ballot designating a person to fill a vacancy, but not under any statutory provision. He acts not pursuant to law, but the constitution. Thus to sustain the relator's position, we are driven to assume that the term "election," as used in the constitution, means something else than an assembling of the electors to vote under and in pursuance of statute authority; and that a valid election may be held independent of and indeed in restraint of legislative regulation. That all the elector has to do, is to deposit his ballot

3 KERN.—24

at the time fixed for " a general election of judges," even though there be no statute regulation, or no authority by law, and the "election" contemplated by the constitution is complete.   In this case it is not pretended that the election was held under any statute.   No notice was given that a vacancy existed, or that the electors were required to fill it.   No provision was made by law for receiving or canvassing the votes cast to fill a vacancy in the judicial office ; or for ascertaining the fact whether there had been any choice. Before the votes were canvassed, the relator took the constitutional oath and claimed to be entitled to the office which he might well do, if the " *election*" was one unregulated by law, and valid by the simple force of a constitutional provision.   I had supposed that it was a proposition, not to be controverted, that it is by virtue of statutes alone that all valid elections are held.   It has never been before pretended that a person could make title to an office, through the popular vote, unless such vote was cast in pursuance of legislative regulation and authority.   All the efficacy given to the act of casting a ballot is derived from the law-making power, and through legal enactments ; and, indeed, the legislature must provide for and regulate the conduct of an election or there can be none.   The convention found the subject of popular election instituted and regulated by law ; and the framers of the constitution are to be understood as speaking of and referring to such an entity as then existed, or might afterwards exist, by force of statute regulation. It is not to be assumed that the " general election of judges," mentioned in the 13th section, is not that authorized by law, and held under and in pursuance of legislative enactments, but a meeting of the people to vote under the organic law itself ; and without such assumption the right of the relator has no foundation.   His argument is, that the constitution appoints the time for the people to meet and vote, and all that is required to constitute a valid election, within the meaning of the 13th section of the judiciary

article, is for the electors to cast their ballots. Nay, further, that any statute regulation practically preventing the filling of a vacancy at the time designated in the constitution is absolutely void. Though the convention of 1846 may have been justly charged with legislating, rather than erecting the frame work of government, I may be allowed to repel the imputation (having been myself a member of that convention), that they so far mistook the nature and purposes of a written constitution as to suppose that it might or could contain within itself the elements of active enforcement. They meant by the term " election" that institution created and existing by operation of law, and that alone, and which, without the exercise of legislative power, could have no efficiency. The relator must make title under and in pursuance of a statute or not at all. He must have received a plurality of votes at an election held pursuant to law, or he has no title or claim to the office. It was at such an election the constitution provided that vacancies should be filled, and at none other.

But let it be conceded that the constitution only fixes the time, and that all other essentials to constitute an election, except giving notice, are left to be prescribed by the legislature and that they have the power, and the obligation rests on them, to provide for conducting the election ; still, would this be a valid election ? It is to be observed that, by fixing the time, the legislature are virtually restricted from declaring that it shall be an essential requisite to a valid election, that the electors shall have official notice that a vacancy exists. Nothing is left to the law-making power but to provide for receiving the ballots, canvassing the votes and declaring the result. Is not notice to the electors, that a vacancy exists and is to be filled, an essential characteristic, independent of any statute requirement, to a valid election ? I think that it is.

Notice to the electors lies at the foundation of any popular elective system. The elector cannot act through

the ballot without notice that a vacancy exists to be filled. Necessity and sound policy demand that every elector shall have both the knowledge and the opportunity to enable him to exercise the elective right deliberately and intelligently. In our elective system the duty of giving notice is devolved upon the secretary of state. The legislature have wisely provided that the notice shall be given by this officer, within a time, and in a way, calculated to give the fullest notice to the electors. It may be, that under this statute regulation, the omission to give the required notice of an election of a judge for a regular term would or ought not to vitiate the election. The elector should be presumed to know the law, and consequently, at what period the regular term of the public officers to be voted for will expire, and be prepared to act accordingly. But there can be no such presumption when the election is to fill a vacancy. I believe that no case can be found holding that notice to the electors of the existence of a vacancy, and calling on them to fill it, is not essential to give validity to the meeting of the electoral body to discharge the special duty. Certainly it could rest on no principle or sound rule of governmental policy. In the nature of things, notice to the elector that a vacancy exists, and calling on him to fill it, is an essential characteristic of a popular election; and public policy and safety require that it should be given in such form as to reach every elector who has the duty to discharge. Notice, therefore, being an essential element of an election to fill a vacancy, whether we regard the election, at which the relator claims to have received a plurality of votes, held in pursuance of the constitution or the law, it was equally invalid.

My conclusions are: 1st. That the 13th section of the 6th article of the constitution is simply a grant of power to the governor to supply vacancies in the judicial office; that it was not intended thereby to designate the precise time for voting in reference to the occurrence of a vacancy, nor is

The People *against* Cowles.

it in any sense a limitation or restriction upon legislative power; 2d. That the whole subject of elections, either as to time or requisite notice, is exclusively within the scope of legislative authority, and that without the action of the legislature, and in pursuance thereof, no valid election can be held; 3d. That the relator must make title to the office through and in pursuance of some statute; 4th. That it is entirely within the scope of legislation to enact that notice must be given of a vacancy a prescribed number of days prior to what is called in the constitution "a general election of judges," and in case, the vacancy should occur intermediate the time fixed for notice and election day, to provide for filling the same until the next general judicial election may be legally held; 5th. That there being no legal or valid election called or held to fill a vacancy in the office of justice of the supreme court, in the first judicial district, on the 6th November last, the act of a part of the electors, in casting their ballots for the relator, though he may have been voted for by a plurality of those who chose to vote, conferred on him no title to the office for the residue of the unexpired term of Judge Morris.

The relator does not pretend that he received his votes at an election held pursuant to law to fill the vacancy; but reposes exclusively on what he deems a constitutional direction, in limitation and restraint of legislative power, and mandatory both upon the people and the legislature. This failing him, though a plurality of the electors may have cast their ballots for him, he is not entitled to the office.

The judgment of the supreme court should be affirmed.

MITCHELL, J., also delivered an opinion in favor of affirming the judgment of the supreme court. T. A. JOHN-SON, J., was also for affirmance.

Judgment reversed.[1]

[1] The decision in this case was announced at the January term 1856, at which the cause was argued.