# THE CITY OF CHICAGO

*v.*

# THE PEOPLE *ex rel.* Henry W. King *et al.*

1. MUNICIPAL CORPORATIONS—*adoption of act of* 1872. An election in a city to determine the question of becoming incorporated under the act of 1872, is not invalid on account of the city authorities failing, in the ordinance calling such election and in the notices thereof, to submit at the same time the question of minority representation.

2. The statute itself submits the question of minority representation in the city council, at the same time and place that the question of becoming incorporated under the general law of 1872 is submitted, and a vote upon minority representation, at such election, is rightful and legal, without any formal submission or notice thereof.

3. SAME—*sufficiency of notice of election.* The statute providing for an election in cities upon the question of incorporation under the act of 1872, requires the mayor and common council to submit the question on the requisite petition, and to appoint a time and place or places at which the vote

may be taken, and that the mayor shall give at least thirty days' notice of such election, etc., but there is no requirement that the notice shall state the places where the election shall be held, or that the question of minority representation is to be voted upon. Therefore, when the places of holding the election are in fact appointed, the proceedings being published, and the notice of the election fails to state the places of voting, the election will not be rendered invalid because the places of voting are not specified in the notice.

4. Same—*effect of change as to places of holding election.* A change in the places of holding an election in a city, of the question of becoming incorporated under the act of 1872, after notice of the election is given, owing to the fact, that in several wards the rooms indicated could not be procured, when the resolution making such changes is published in the corporation newspaper before the day of election, will not invalidate the election so held.

5. Election—*irregularities and frauds do not necessarily vitiate.* The fact, that there are gross irregularities and frauds on the part of the judges of election, in several wards in a city, will not necessarily render the election void. Such irregularities and frauds may furnish grounds for rejecting the returns from such wards as evidence of the votes cast, but this may not change the result as canvassed and announced.

6. Pleading—*as to matters to defeat an election.* In a proceeding by *quo warranto* against a city, requiring it to show by what authority it exercised the franchises conferred by the act of 1872, where the city, by plea, set up an election under that law resulting in a vote in favor of incorporation under the act, a replication attempting to impeach and invalidate the election, by charging frauds and irregularities in certain wards, which alleges that the returns in such wards showed a majority for incorporation which exceeds the entire majority in favor of incorporation, as found and declared by the common council, is defective in not stating that the returns in such wards affected the actual result, or as to the majority of legal votes cast.

7. Quo warranto—*against municipal corporation.* An information in the nature of a *quo warranto*, on the relation of a private individual, will not lie against a municipal or public corporation, such as a city, village, town, county, township, or the like. Per McAllister, Breese and Walker, JJ.

8. Same—*does not lie to contest election to adopt a charter.* An election for the adoption of a charter, by a city, town or village, can not be contested by *quo warranto.* Per Walker, J.

Appeal from the Criminal Court of Cook county; the Hon. Henry Booth, Judge, presiding.

On the 10th of April, 1872, the General Assembly of this

State passed an act, entitled " An act to provide for the incorporation of cities and villages." (Rev. Stat. 1874, p. 211.)

By the first section of this act it was provided, that whenever one-eighth of the legal voters of any city, voting at the last preceding municipal election, should petition the mayor and council to submit to a vote of the electors of the city the question of becoming incorporated under said act, it should be the duty of the mayor and council to submit such question.

The 53d section of the same act provided that whenever said act should be submitted to a vote of the electors, there should be submitted, at the same time, for adoption or rejection, the question of minority representation in the city council.

On the 4th of January, 1875, the common council of the city of Chicago, having received a petition signed by the requisite number of voters, passed a resolution appointing the 23d of April, 1875, as the day for holding such election, and by said resolution submitted the question of becoming incorporated under said act, without providing for the submission of the question of minority representation.

It was further provided in said resolution, that the polling places should be the same as at the election of State and county officers, held in the said city on the 3d of November, 1874.

On the 20th of March, 1875, a notice was given, by publication in a Chicago newspaper, that an election would be held on the 23d day of April, 1875, as to whether the city should become incorporated under said act. The notice gave no information as to the places where the election was to be held, and contained nothing in regard to the question of minority representation.

On the 16th of April, 1875, the common council passed another resolution, fixing other places for holding said election than those specified in the resolution of the 4th of January, above named. Under the resolution of January 4 there would have been ninety-two polling places, while under the resolution of April 16 there were but twenty, one in each ward in the city, there being twenty wards.

An election was held on the 23d of April, 1875, the result

of which, as declared by the common council upon a canvass of the votes, was the adoption of the act of 1872 as the city charter. This result was announced on the 3d of May, 1875, and from that day the city claimed to be incorporated under said act.

On the 14th of May, 1875, there was filed an information in the nature of a *quo warranto*, against the city of Chicago, asking that the city be required to answer by what warrant it claimed to use and enjoy the franchises conferred by said act of 1872. The court below sustained demurrers to several pleas of the defendant, and gave a judgment of ouster. From that judgment the city brings this appeal.

Mr. T. Lyle Dickey, Mr. James P. Root, Mr. M. F. Tuley, and Mr. E. A. Storrs, for the appellant.

Messrs. Lawrence, Campbell & Lawrence, and Messrs. Rosenthal & Pence, for the appellees.

Mr. Justice Sheldon delivered the opinion of the Court:

In view of the statements made by the counsel of the respective parties, that, for the purpose of deciding the substantial questions presented by this record, it will only be necessary for the court to direct its attention to the fifth plea, we shall, as respects the errors assigned on the part of the appellant, confine ourselves to the questions raised and discussed under that plea, to which a general demurrer was sustained.

The plea sets forth, in detail, all the several steps which were taken in regard to the submission of the question of becoming incorporated under the act of 1872, and, owing to its great length, we omit to set it out, deeming it unnecessary to do so for the purpose in hand.

It is insisted on the part of the relators, that the election, as set forth in this fifth plea, was invalid on three different grounds, all of which appear in the plea:

1st. The act of 1872 required the question of "minority representation" to be submitted to the popular vote at the

same time with the question of the adoption of the new charter, and that this was not done.

2d.   The notice of the election, as set forth in the plea, was fatally defective in not stating the places where the election was to be held, and the two questions upon which the vote was to be taken.

3d.   The resolution of the common council of the 4th of January, 1875, directing that the polling places should be the same as at the election of State and county officers, held on the 3d day of November, 1874, in said city of Chicago, was, as to this provision, rescinded by a resolution of the council, passed April 16, 1875, by which other and different polling places were fixed, and this was done only seven days prior to the day of election, which was held at the polling places fixed by the resolution of April 16.

The first two sections of the act under consideration are as follows:

" Sec. 1.   *Be it enacted, etc.*   That any city now existing in this State may become incorporated under this act in manner following:  Whenever one-eighth of the legal voters of such city, voting at the last preceding municipal election, shall petition the mayor and council thereof to submit the question as to whether such city shall become incorporated under this act to a vote of the electors in such city, it shall be the duty of such mayor and council to submit such question accordingly, and to appoint a time and place, or places, at which such vote may be taken, and to designate the persons who shall act as judges at such election.   But such question shall not be submitted oftener than once in four years.

" Sec. 2.   The mayor of such city shall give at least thirty days' notice of such election, by publishing a notice thereof in one or more newspapers within such city; but if no newspaper is published therein, then by posting at least five copies of such notice in each ward."

Article 4 of the act, headed " Elections," in section 53, provides:   " Whenever this act shall be submitted to the qualified

electors of any city for adoption, there shall be submitted, at the same time, for adoption or rejection, the question of minority representation in the city council or legislative authority of such city. At the said election the ballots shall be in the following form: 'For minority representation in the city council,' or 'Against minority representation in the city council.'" Then follow, in the same section, provisions for subsequent submissions, in case the first vote is against the proposition, and provisions as to the canvass of the votes, and the effect of adopting minority representation.

As respects the first of the foregoing reasons for holding the election invalid, that there was a failure to submit the question of minority representation, it is contended that that particular question should have been submitted by the passage of an ordinance by the city council directing its submission, and by a notice, given by the mayor, stating the fact of such submission.

Certainly the statute does not expressly require this. It is silent as to by whom, or how, the question of minority representation shall be submitted. The language is, "there shall be submitted, at the same time, for adoption or rejection, the question of minority representation," etc. Why the need of an ordinance directing that there shall be submitted such question, when the statute itself says there shall be a submission of it? It would be superfluous for the mayor and council to appoint a time and place at which a vote should be taken on the question of minority representation distinctly, because, when they had appointed a time and place for the vote upon the question of incorporation under the act, there was then already fixed a time and place for voting upon the question of minority representation, namely: the same time and place with the vote upon incorporation, so expressly fixed by the act itself.

There was, moreover, the action of the city council upon the question of minority representation, recognizing and virtually declaring its submission. The plea was, that on the 19th

502          City of Chicago *v.* The People *ex rel.*    [Sept. T.

Opinion of the Court.

day of April, 1875, the common council adopted and spread upon its records a resolution directing the city clerk to cause to be printed one hundred thousand ballots, with the words: "For minority representation in the city council," and one hundred thousand ballots with the words: "Against minority representation in the city council," printed on the ballots, and to see that the same were properly distributed among the wards, and delivered to the judges of election on the 23d of April, 1875; and that, in pursuance of the resolution, the ballots were so printed and distributed, and were, in fact, distributed among the voters before and at the election; and that said proceedings of the common council, embracing a copy of the resolution, were published in the corporation newspaper of the city on the 21st day of April, 1875; that the voters at such election did vote upon the question of minority representation; that returns of such votes were made, and the result, as declared by the common council upon a canvass of such votes, was, that a majority of the votes cast at such election on that subject were against minority representation in the city council.

We must think that the electors rightfully voted upon this question; that their vote upon it was a valid one, although there had been no formal submission of the question by the common council—that the act authorized such vote.

We are of opinion, then, that the question of minority representation should be regarded as having been submitted to the popular vote at the same time with the question of the adoption of the new charter. We arrive at this conclusion with the less reluctance, from the fact that the submission is not a finality, the statute providing that at any subsequent time, not more than once in every two years, the question of minority representation shall be submitted to the popular vote, on the requisite petition.

As to the second ground, that of defective notice of the election, the notice was as follows:

"ELECTION NOTICE.

"MAYOR'S OFFICE, CITY OF CHICAGO,
"*March* 20, 1875.

"Notice is hereby given, that on (23d) twenty-third day of April, 1875, an election will be held in the city of Chicago, at which said election the question will be submitted to be voted upon, by the legal voters of said city, as to whether said city shall become incorporated under an act of the General Assembly, entitled 'An act to provide for the incorporation of cities and villages,' approved April 10, 1872.

"H. D. COLVIN, *Mayor*."

The alleged defect in the notice is, in not stating the places where the election was to be held, and the two questions upon which the vote was to be taken.

The first section of the act provides that the mayor and common council shall submit the question of becoming incorporated under the act, and appoint a time and place, or places, at which the vote may be taken. The second section, as to notice, provides that the mayor shall give at least thirty days' notice of such election, by publishing a notice thereof in one or more newspapers within the city. There is no express requirement that the notice should state the places where the election is to be held, or that the question of minority representation was to be voted upon, but only that thirty days' notice shall be given "of such election, by publishing a notice thereof," that is, of an election as to whether the city shall become incorporated under the act.

According to the averment of the plea, the common council, in pursuance of the first section of the act, did, in the same resolution by which they submitted the question of incorporation, appoint the time and places of the election; and such resolution was, on the 6th day of January, 1875, published in a daily newspaper in Chicago—the corporation newspaper in which it was required, by law, that the proceedings of the common council should be published. Had any elector wished to ascertain the places of the election beyond what the notice

informed him, the means of knowledge were at hand, by recurring to the records of the common council, the body whose duty it was to appoint the places, as the law informed him.

An analogous case with the present is that of *The Chicago and Iowa Railroad Co.* v. *Pinkney*, Sept. T. 1874, which was the case of an election by a town as to whether it would make a donation to the railroad company of $75,000 in bonds.

The statute required that the petition for the election should state the amount of the bonds, the rate of interest they were to bear, and the time when the bonds should be payable, and that notice should be given of the election, "stating fully in the notice the object of the election." The notice said nothing about the length of time the bonds should run, or the rate of interest they should bear. The petition, filed with the town clerk, complied with the requirement of the statute. The notice stated that a petition had been filed in the town clerk's office, for an election as to whether the town would make a donation to the company of $75,000 in bonds. On objection to the validity of the election, because the notice was insufficient in the particulars above named, it was held, that the petition on file in the clerk's office afforded information how long the bonds were to run, and their rate of interest, and that the notice, in connection with the petition, was sufficient. So here, the notice given, in connection with the resolution of the common council, fixing the polling places, we are of opinion, sufficiently fulfilled the requirement of giving "notice of such election," although the notice itself did not state the places where the election was to be held.

Any elector wishing information upon that subject, was referred by the law to a source of information—the record of the proceedings of the common council.

Electors must be supposed to have knowledge of such a public law, and one notified as about to be submitted to their action, for approval or rejection.

*Vieley* v. *Thompson*, 44 Ill. 9, and *Harding* v. *Railroad Co.* 65 Ill. 90, are referred to as cases where this court has held special elections to be void, when held without the required no-

tice.  We regard these cases as quite distinguishable from the one under consideration.

The one was an election as to levying a bounty tax; the other, an election as to a subscription by a county to the capital stock of a railroad company.  In both cases, the statute required notice for a specified number of days to be given of the election.

The notices given were not for the required length of time, and the elections were held invalid on that account.

There was, there, a violation of an express statutory requirement.  Here, as has been stated, there was no violation of any express requirement of the statute.

The places only, and not the time of holding the election, are here involved.  The place of holding an election would seem to be one of the least important of the things pertaining to the notice, especially when the place is not to be fixed by the notice, but is fixed by public authority, as in this case, by the legislative body of the city.  Previous notice of the time may be important, to enable the voter to arrange beforehand with a view thereto.  Notice for the full prescribed length of time, may be essential, to afford opportunity for information and consideration, in order to enable the voter to vote intelligently.

But it would not seem to subserve any important end, that the voter should have previous notice, for any length of time, of the place of holding the election.

There was here a polling place appointed in each elector's ward.  Had an elector, on the morning of election day, been desirous of voting, but did not know the place of the election, he obviously might have ascertained it at once, without difficulty, upon inquiry; and it is not perceived wherein he was subject to be prejudicially affected by the want of a previous knowledge of the place where the election was to be held.

As to the notice not stating that minority representation would be submitted to be voted upon, there is, as before remarked, no express requirement of the statute that the notice should so state.

The act, as we hold, by its own force authorizing a vote upon the question of minority representation, without the formal submission of it by the common council, and the act also fixing the time and place of the vote upon the question, viz: the time and place of voting upon the question of becoming incorporated under the act, the election upon the question of minority representation might be legally holden, we think, without notice having been given of it. The electors may be well presumed to know when an election fixed by law at a certain time and place, is to be held. The case, in this respect, of the question of minority representation, we are of opinion, falls within the general rule laid down in Dillon on Corporations, 2d Ed. § 136: "Elections fixed by law at a certain time and place, may be legally holden, although notice has not been published or given; but if the time be not defined by statute, and is to be fixed by notice, the notice required is imperative," and see Cooley Const. Lim. 603. *The People* v. *Cowles*, 13 N. Y. 350; *The People* v. *Hartwell*, 12 Mich. 508; *Foster* v. *Scarff*, 15 Ohio St. 532; *State* v. *Goetre*, 22 Wis. 363.

So soon as the time and place were appointed of the election on the question of becoming incorporated, then the time and place for the voting upon the question of minority representation was fixed, by law, as at the same time and place with the former. Notice of such former election, taken with the law, would serve as notice of the election upon the question of minority representation.

The third ground of objection to the validity of the election, is the change made by the common council, April 16, 1875, in the places of holding the election. The plea avers that on that day the common council had definitely ascertained that several of the places at which the vote was taken at the November election, 1874, could not be procured for such purpose for the election to be held on the 23d day of April, 1875, and that thereupon the common council passed a preamble and resolution, declaring the ascertainment of such fact, and did thereby fix, as the places where the election should be held, one place in each ward of the city, nine or more of which

places were the same ones fixed by the first named resolution of January 4, 1875, and the remainder were in the vicinity of the polling places of such wards as fixed by said resolution of January 4, 1875, and that such preamble and resolution were published in the corporation newspaper, on the 18th day of April, 1875; and that the places at which the election was to be held were, before the 23d day of April, 1875, generally known to the voters of the city.

This change in the polling places was made by the lawful authority, the common council, and the election was held at the places last fixed. To be sure, there was not thirty days' notice given that the election would be held at these last designated places; but there was thirty days' notice of the time of the election. It must be admitted that there may be cases where a notified place of holding an election may be properly changed without notice thereof, as, for instance, where a building designated for such purpose should be destroyed by fire. There is reason to believe, from the circumstances, that the places at which the election was held, were generally known to the voters of the city before the day of the election. It is not perceived wherein the change made was calculated to produce any injurious effects, and we think that it should not be held a sufficient ground to invalidate the election. And, holding the same with respect to the other above grounds of objection made by the relators, we are of opinion that the election, as set forth in the fifth plea, was a valid one, and that the demurrer to the plea should have been overruled.

Appellee has assigned cross-errors on the ruling of the court below, in sustaining demurrers to the fourth, fifth and sixth replications to the third amended plea. The sixth replication was as follows:

"And by way of further replication to said third plea, as amended, leave of the court for that purpose being first had and obtained, said Charles H. Reed, State's Attorney, etc., says, *precludi non*, because he says that at the pretended election, so held on the 23d day of April, 1875, no poll books were kept of the votes at the polling places in the 1st, 2d, 7th, 8th, 9th,

11th, 18th and 20th wards in said city.    That no clerks were appointed for said polling places, nor were any clerks present at such places, nor were any poll books or other record kept, upon which were entered the names of the voters, so voting at such places, nor were any numbers placed upon the ballots so cast at such polling places.

"And he further avers, that all the ballots, so cast at said polling places, were counted by said judges of said polling places.

"And he further avers, that the judges of said polling places made returns of the ballots, so cast at said places, to the common council of the city of Chicago.

"And he further avers, that no clerks attested the returns of said judges of said polling places.

"And he further avers, that no poll lists or tally sheets were returned by said judges with the said returns, so made by them to the said common council.

"And he further avers, that said common council did canvass said pretended returns of the judges of the polling places in said 1st, 2d, 7th, 8th, 9th, 11th, 18th and 20th wards, and did count and allow the returns so made by the said judges of election in said wards last mentioned as having been cast at said pretended election in said wards.

"And he further avers, that the returns of said judges of election, in said wards last mentioned, so canvassed by said common council, showed a majority in favor of incorporating said city under said law of 1872, in said plea referred to, which majority exceeded the entire majority in favor of incorporating under said act, as found and declared by said common council to be the result of the election in all the wards of said city, to-wit: more than five thousand votes.

"And he further avers, that some ballots were cast at said pretended election, for, and some against, minority representation in the common council of said city.

"And he further avers, that at all the polling places in said city, to-wit: at the polling places of the 1st, 2d, 7th, 8th, 9th, 11th, 18th and 20th wards in said city, only one ballot box was

used by the judges of election at said polling places respectively, and that each voter was permitted to cast two ballots at his proper place of voting, and that many voters, to-wit, five thousand, actually cast two ballots at their respective polling places.

"And he further avers, that the said judges of election, at their respective polling places aforesaid, received two ballots from each of the voters so offering to cast two ballots, and that said judges, in said cases, deposited both ballots so cast in a single ballot box, so kept by said judges respectively, as aforesaid.

"And he further avers, that during the progress of said election, and subsequent thereto, large numbers of ballots were fraudulently inserted into the said ballot boxes at the voting places of the 1st, 2d, 7th, 8th, 9th, 11th, 18th and 20th wards in said city, which were not cast by any voter, and that after the closing of the polls, at the respective polling places in said wards, the said judges of election in said wards respectively, to-wit: the judges of election in said 1st, 2d, 7th, 8th, 9th, 11th, 18th and 20th wards, in making up their returns respectively, added to the actual count of votes in favor of said act of A. D. 1872, a large number, to-wit: two thousand votes, which were never cast, and which were never counted out of said ballot boxes.

"And he further avers, that all the returns, so made by said judges of election, were canvassed by said common council, and the result was declared to be in favor of adopting said act of A. D. 1872.

"Without this, that a valid election was held in said city, in pursuance of said petition, resolution and notice, in manner and form as in said plea is alleged.

"And of this, he puts himself upon the country, etc."

The two other replications were like the sixth, except in the omission of one or more of the particulars of irregularity therein alleged.

The demurrers to the replications were special, assigning various causes of special demurrer.

The averments as to the casting of two ballots do not necessarily impute anything wrongful to the voters. There were two questions voted upon, of incorporation, and minority representation, and we do not understand the averment of the voters casting two ballots, to import anything more than that they cast a ballot upon each one of the two questions.

According to the averments of the sixth replication, there was gross irregularity in conducting the election in these specified wards, and fraud on the part of the judges of the election in those wards. But an election is not necessarily to be made void on such grounds, especially in the other wards of the city. The rules prescribed by the law for conducting an election, are directory, merely, not imperative. *Piatt* v. *People*, 29 Ill. 54.

There may be reason shown here for rejecting the returns made from the wards specified, as evidence of the votes cast in them, as in *Knox County* v. *Davis*, 63 Ill. 405, where it was held that the poll book and certificate of an election in one of the towns of the county were rightfully rejected as evidence of the vote of the town, because of fraudulent practices in the conducting of the election.

In support of the ruling of the court in sustaining the demurrers to these replications, we think it sufficient to say that the replications do not aver that the matters alleged affected the actual result of the election. The averment in that respect is, that the returns in these wards showed a majority for incorporation which exceeded the entire majority in favor of incorporation, *as found and declared by said common council to be the result of the election in all the wards of said city*, to-wit, more than five thousand votes. It was not enough that the result of the election, as found and declared by the common council, should have been affected, but it must have been the actual result; the question being, whether a majority of the legal votes actually cast were in favor of adopting the law. The result, as found and declared by the common council, was but evidence of what was the actual result.

In one or more other wards of the city, there might have been equal irregularity affecting the returns of a like number

of votes against incorporation, counterbalancing the effect of the irregularities charged, as respects the actual result. The issue tendered in this respect should not have been upon the result as found and declared by the common council, but upon the actual result, or as to the majority of legal votes polled.

We are of opinion that the demurrers were properly sustained to the replications.

It has not been necessary to consider whether this proceeding will lie against a municipal corporation as a body.

For error in sustaining the demurrer to the fifth plea, the judgment will be reversed and the cause remanded.

*Judgment reversed.*

Mr. Justice McAllister:

I concur, but go further than the above opinion. If the information was bad in substance, the demurrer of relators to defendant's special pleas should have been carried back and sustained to the information. I think the information was bad in substance, on the ground that neither at common law nor under our statute will an information in the nature of *quo warranto* upon the relation of private individuals, lie against a municipal corporation *as a body*. As I understand the English cases at common law, such an information against municipal corporations, on the relation of private individuals, will not lie. *Rex* v. *The Corporation of Carmanthen*, 2 Burrows, 869, S. C. 1 W. Blackstone, 187, *The People* v. *Richardson*, 4 Cow. 109, and cases there cited. This case is not within our statute. That includes private corporations only.

The recognition of such a doctrine would be fraught with danger to the rights and liberties of the people under local governments. If private individuals may institute and prosecute such cases against the city of Chicago as a body, they may, by parity of reasoning, against the county of Cook as a body, to test the validity of its organization. And if the proceeding will lie, then, by the default or mispleading of an attorney, judgment of ouster may go, and three-quarters of a

million of people be divested of all corporate rights and privileges under such local government. It would lead to confusion and disorganization of society, if not revolution. If it will lie as to cities and counties, why may it not as to States? Why may not individuals institute suits in the Federal courts, against the State of Illinois, to determine whether the constitution of 1870 was regularly adopted, and in the same way, by default, or the verdict of a jury, obtain a judgment of ouster? Such can not be the law. The usual and legal course is, to proceed against the individual officers who, it is claimed, have usurped the franchise as complained of. The court has not passed upon this question, by the above opinion. I think it is raised, and therefore express my views upon it.

For the reasons given, the demurrer of relators to the defendant's pleas should have been carried back to the information, and sustained to that, as bad in substance.

Mr. JUSTICE BREESE: I am disposed to think, an information in the nature of *quo warranto* by private individuals, will not lie against a municipal corporation as such, and that the demurrer to the special pleas should be sustained to the information.

Mr. JUSTICE WALKER: I incline to the opinion that the information can not be maintained against a city, town, village, county, township or other municipality, as a body, but it should be against the officers of the body; that an election for the adoption of the charter can not be contested in such a proceeding.