MICHAEL G. DALE

*v.*

JOHN G. IRWIN.

1. CHANCERY—*contested elections.* The proceeding to contest an election, under the act of 1872, is, to all intents and purposes, a chancery proceeding, and subject to all the rules governing the same.

2. AMENDMENT—*of petition or bill to contest an election.* It is proper to permit amendments to the petition filed by a contestant of an election, under the act of 1872.

3. ELECTIONS—*of numbered and unnumbered ballots.* A numbered ballot should not be rejected in counting the votes at an election, merely because an unnumbered ballot is found folded within the same.

4. SAME—*of the place of holding an election.* The place of holding an election was fixed, by the proper authority, at a certain store. When the judges of election and the voters appeared at the store on the day of election, the proprietor forbid them the use of it. They then repaired to a building on the same side of the street, and not more than 50 or 100 feet from the store, and there the poll was opened, and the election proceeded without hindrance, all the voters knowing where the poll was opened, as it was readily seen from the store, and made manifest by the crowd going and returning therefrom. No fraud or improper motive was shown to produce this change, nor did any voter complain that he was deprived thereby of an opportunity to vote: it was *held,* in a proceeding to contest the election, there was no wrong done in holding the election at a place other than that originally appointed.

5. SAME—*who are voters—college students—what is a "permanent abode."* The "permanent abode" prescribed by the Revised Statutes of 1874 as the criterion of the residence required to constitute a legal voter, does not mean an abode which the party does not intend to abandon at any future time. In the sense of the statute, a "permanent abode" means nothing more than a domicil, a home, which the party is at liberty to leave as interest or whim may dictate, but without any present intention to change it.

6. The undergraduates of a college, who are free from parental control, and regard the place where the college is situated as their home, having no other to which to return in case of sickness or domestic affliction, are as much entitled to vote as any other resident of the town pursuing his usual avocation. It is, *pro hac vice,* the home of such students—their permanent abode, in the sense of the statute.

7. As a general fact, however, undergraduates of colleges are no more identified with residents of the town in which they are pursuing their studies than the merest stranger. Nor would the simple fact that such students paid a road tax in labor while in attendance at the college, have any weight in determining the question of residence, the law under which such road labor was bestowed not requiring residence to render the party liable, but simply inhabitancy.

8. SAME—*as to residence of paupers.* A party does not forfeit his residence in a precinct in which he was a voter, merely by becoming a county charge and an inmate of the poor house.

9. NATURALIZATION OF ALIENS—*jurisdiction of county courts.* The county courts of this State have jurisdiction to grant certificates of naturalization to aliens.

10. FORMER DECISION. The doctrine on this subject, as announced in *The Board of Supervisors of Knox County* v. *Davis*, 63 Ill. 405, is overruled.

11. NATURALIZATION OF ADULT—*effect upon illegitimate children.* A foreign born person, who was alleged to be illegitimate, came to this country as a member of the family of his reputed father, whose wife was the mother of the boy. The reputed father was naturalized while the alleged illegitimate child was an infant: *Held*, as the child was a member of his reputed father's family when his father was naturalized, and he an infant, that by virtue of the act of Congress he became naturalized, and that the question of his legitimacy would not be inquired into in a proceeding to contest an election.

12. REGISTRATION OF VOTERS—*of voting without registration or proof of right.* Where a person votes at an election without having been registered, and without any proof of right, if it does not appear he was challenged, or any objection made to his voting, the presumption must be that he was a legal voter, and so known to the judges of the election.

APPEAL from the Circuit Court of Madison county; the Hon. WILLIAM H. SNYDER, Judge, presiding.

Messrs. JOHN M. & JOHN MAYO PALMER, and Mr. G. B. BURNETT, for the appellant.

Mr. LEVI DAVIS, Mr. CHAS. P. WISE, Messrs. GILLESPIE & HAPPY, and Messrs. KROME & HADLEY, for the appellee.

Mr. JUSTICE BREESE delivered the opinion of the Court:

The record in this case shows that, at an election held at the several election precincts in the county of Madison, on the thirteenth of April, 1874, for county judge, there were three persons voted for, namely: appellant, M. G. Dale, appellee, John G. Irwin, and A. H. Gambrill. On canvassing the returns, by the clerk of the county court, aided by two justices of the peace of that county, it was certified by them that appellee, Irwin, had received two thousand and 'ninety-two votes, appellant, M. G. Dale, had received two thousand

and ninety votes, and A. H. Gambrill nine hundred and thirty-five votes.   On this showing appellee received the certificate of election.

Whereupon appellant, Dale, on the 12th day of May, being within thirty days thereafter, filed in the office of the clerk of the circuit court of Madison county, a statement, in writing, in the form of a bill in chancery, verified by his own affidavit, alleging that he was duly elected to the office, and that appellee was not elected, and setting forth the points on which he would contest the election.   The bill prayed that the defendant, Irwin, might be summoned to answer the statement in the bill, and that upon a hearing the court would decree appellant duly elected to the office of county judge.

The defendant was duly summoned to appear and answer the statement, and at the return term of the circuit court, it being the October term, 1874, defendant appeared and entered his motion to quash the petition, which motion was allowed. Whereupon, at the same time, the complainant and petitioner obtained leave to amend the petition, which was done, and a rule entered against the defendant to plead to the amended petition ; whereupon, the defendant entered his motion to strike the amended petition from the files, which motion was disallowed.

The defendant, thereupon, filed his sworn answer to the amended petition, and he also filed exceptions to the opinion of the court, allowing appellant to amend his petition and in refusing to strike the amended petition from the files.   Afterwards, at the same term, leave was granted appellant to amend his amended petition, which was done, and the same verified by his oath.

The defendant then entered a motion to strike the petition so amended from the files, which was disallowed, and exception taken.   Thereupon, the defendant filed his sworn answer to the amended petition, to which there was a replication by complainant, and the cause heard on the original petition and amendments thereto, answer, replication and proofs.

The court found defendant duly elected, and decreed against the petitioner for the costs.

To reverse this decree this appeal is taken, and this finding and decree assigned as error. .

We have been thus particular in setting out the proceedings in the circuit court, as appellee has made points upon them which it is important to notice.

No point is made on the order of the court allowing the petitioner to amend his petition after the same had been quashed, the subsequent order to amend being regarded as virtually setting aside the order to quash, and, though irregular, seems to have been acquiesced in by the defendant.

The ground assumed by the appellee, in his exception to the order allowing the petition to be amended, is, that this being strictly a statutory proceeding, the petitioner should be confined to the points made in his original statement or petition; that the proceeding being neither in chancery nor at the common law, the court had no power to allow amendments of any kind, but should be guided by the statute alone, and as no provision is made therein for amendments, the court was powerless to allow them.

This brings us to the consideration of the question made so prominent in appellee's brief and argument: what is the nature of this proceeding? The several sections of chap. 46, title "Elections," in force July 1, 1872, which we will cite, we think satisfactorily answer the question.

Section 113, of this chapter, provides that the person desiring to contest such election shall, within thirty days after the person whose election is contested is declared elected, file with the clerk of the proper court a statement, in writing, setting forth the points on which he will contest the election; which statement shall be verified by affidavit, in the same manner as bills in chancery may be verified.

Section 114 provides, upon the filing of such statement, summons shall issue against the person whose office is con-

tested, and he may be served with process or notified to appear in the same manner as is provided in cases in chancery.

By section 115, evidence may be taken in the same manner and upon like notice as in cases in chancery.

By section 116, the case shall be tried in like manner as cases in chancery.

By section 119, in case the contest is in relation to the election of some person to an office, the judgment of the court shall declare as elected the person who shall appear to be duly elected. And by section 123, in all cases of contested elections in the several circuit courts or county courts, appeals may be taken to the Supreme Court in the same manner and upon like conditions as is provided by law for taking appeals in cases in chancery from the circuit courts.

From these citations, the conclusion is reasonable that the proceeding to contest such an election is, to all intents and purposes, a chancery proceeding, and subject to all the rules governing them; and it was so held by this court in *Talkington* v. *Turner*, 71 Ill. 234.

Previous to this act of the General Assembly, this court had held in *Moore* v. *Hoisington*, 31 Ill. 243, that a court of chancery had no jurisdiction to inquire into the validity of an election; and in *Moore* v. *Mayfield*, 47 Ill. 167, that an appeal did not lie in a contested election case, as it was not such "a case" as contemplated by the constitution—that it applied only to an action at law or a suit in chancery, and this was neither. To obviate the results likely to flow from these rulings, this act was, doubtless, passed. The whole proceeding under this act of 1872, from its incipiency, by filing a statement verified by affidavit, followed by a summons against the defendant to appear and answer, to the final judgment, has all the incidents of a regular bill in chancery, and an appeal is allowed to the Supreme Court in the same manner and upon like conditions as is provided for taking appeals in cases in chancery from the circuit courts.

This view disposes of the exceptions taken to the decision of the court allowing the amendments to the original petition.

We can not think the position taken by appellee, as to the meaning and purpose of this act, tenable or just. If he is right in seeking to confine the contestant to the points contained in his original statement, great injustice might be done in many cases, and this case is one of them. The position is, as we understand it, that, within the thirty days after the result of the election is declared, the contestant must specify all the points on which he grounds the contest, and that if, after that time, the contestee shall admit the facts charged, which are sufficient of themselves to deprive him of his office, he can then attack the contestant's right to the office, on any ground deemed sufficient, and against which the contestant has no right to defend, except by traversing the averments of the answer. We think it plain, regarding the obvious intent and purpose of the statute, that a contestant, after stating the points of contest in the mode required by the act, can avail of any amendment or pleading to meet the tactics of his opponent, and bring before the court the real points of the case. As special replications are now out of use, the same object is effected by amendments to the bill, and suit them to the case, as contestant shall be advised. 2 Daniell's Chy. Prac. 968.

This was the course adopted by the petitioner, under the sanction of the court, and in this there was no error.

It now becomes important to notice the points of contest made by appellant, in his original statement.

Complainant averred, in his statement, or bill, as follows:

"Your orator has been informed, and verily believes, and so charges the fact to be, that, in the election precinct of New Douglas, on the counting of said votes, two unnumbered ballots were found in the ballot-box, at said election, each folded within a numbered ballot; that both of said numbered ballots were for your orator for said office, and that both of said num-

bered ballots, together with the unnumbered ballots, were thrown out and rejected by the judges of election in said precinct, and were not counted in the returns from said precinct; and that in each of the election precincts of Silver Creek, Marine, Madison and Collinsville, at the counting of said votes at said election, one unnumbered ballot was found in the ballot-box, folded within a numbered ballot, and that each of said numbered ballots was for your orator for said office of county judge; that the judges of election in each of said precincts threw out the said numbered ballots, together with the said unnumbered ballots, and did not count said numbered or unnumbered ballots in making up their returns as aforesaid; and your orator further avers, that the said numbered ballots so thrown out and not counted in the said precincts of New Douglas, Silver Creek, Marine, Madison and Collinsville, were not thrown out and rejected because of any excess of ballots over the names entered on each of the poll-books of said several precincts, or because they were cast by persons not entitled to vote, but your orator alleges that the said numbered ballots so thrown out and not counted as aforesaid, were improperly and unlawfully thrown out by said judges, and ought to have been counted for your orator; and that if said ballots so improperly and unlawfully thrown out had been counted, in making up said returns, as they should have been, your orator would have had a greater number of votes at said election, for said office, than said Irwin, and would have been entitled to the certificate of election."

This showing, *prima facie*, entitled the contestant to the certificate of election, and, if not controverted, such would have been the decree of the court. The votes so cast out, if counted for appellant, would have raised his aggregate to 2096, and one at the Bethalto precinct subtracted from appellee's vote, would have left to him but 2091, showing a majority of five for appellant, giving the election to him beyond all cavil.

12—78TH ILL.

The first and only important amendment made by the contestant, of his petition, under leave of the court, was, by inserting the allegation that the unnumbered ballots, enclosed in those numbered, cast at the New Douglas precinct, were also cast for him.

In the answer filed by appellee, on the 5th of November, being of the same October term, 1874, he neither admitted nor denied the fact of the two numbered ballots in the New Douglas precinct, and the single numbered ballot in each of the precincts of Silver Creek, Marine, Madison and Collinsville, were cast for the contestant, or that they were thrown out and rejected by the judges, and he denies, if, as alleged, the numbered ballots were unlawfully rejected, and had been counted for the contestant, in making up the returns, that contestant would have had a greater number of legal votes than the defendant, or that he would have been entitled to the certificate of election, nor if, from the sum total of defendant's vote, one vote counted for him by the judges at Bethalto precinct, when the same should not have been so counted, the result would not have been changed, if all legal votes cast for him had been returned and counted, and the illegal votes cast for contestant had been rejected.

The answer is, in scope and substance, this: True, five votes, at New Douglas precinct and the other precincts named, were cast for you which were not counted for you, and one vote counted for me at Bethalto precinct to which I was not entitled. On this showing, the certificate of election should have been given to you, but I will contest your right to the office, by showing you received illegal votes more than sufficient to determine the majority in my favor.

The defendant then, in his answer in support of the allegation of illegal votes having been cast for contestant, specifies the names and the precincts at which the persons named voted.

To meet this new phase of the case, appellant had leave to amend his petition, which he did, on the 17th of November,

1874, by again averring that appellee was not elected to the office, but that appellant was elected; that more votes were returned in favor of appellee, by the judges of the election in the several precincts named, than were cast by legal voters for appellee in such precincts, specifying the names of the voters and the precincts at which they voted.

In this amendment, appellant alleged that certain persons (naming them), in number, six, voted at the Edwardsville precinct for defendant, when three of them (naming them) were not residents of that precinct, and two of them (naming them) had not resided in the State for one year, and one of them, Charles Colter, was not twenty-one years of age; that certain persons (naming them), five in number, voted for the defendant in the first and second wards, election precinct of Alton, and that neither of them resided in that precinct, and that various other persons (naming them), seventeen in number, sixteen of whom voted for the defendant in Upper Alton precinct, who did not reside in that precinct, and one of them, L. G. Bigwood, had not resided in the State one year preceding the election.

As to the six persons named as having voted at the Edwardsville precinct for appellee, it is conceded by appellant there is nothing in the testimony to impeach the votes of four of them. As to the other two, John W. Buckley and Gotlieb Schmidt, it is in proof by Buckley himself that he was a resident and lived in Bethalto precinct, and that he voted at this election. He declined to state where he voted. Joseph Chapman, one of the judges of the election at the Edwardsville precinct, and well acquainted in the county, having lived in it forty years, and knew Buckley, thinks he voted—found his name on the poll-book, and there is but one person of that name in the county. It is not denied he voted for appellee. James Wilson also swears Buckley voted at Edwardsville. As to Schmidt, it is proved by Buckley he was a resident of Bethalto precinct, and, by L. Ebenhardt, that he voted at this election at the Edwardsville precinct. It is not denied

he voted for appellee. From Buckley's testimony, it is evident he knew he was not exercising the franchise at the proper place, as he declined stating where he voted, lest it might criminate him. So with regard to Schmidt. He knew, as he lived in Bethalto precinct, he was violating the law by voting at Edwardsville, and he knew the boundaries of the precincts, as the dividing line is marked by Indian creek, and neither of them had been registered as voters in that precinct.

But, passing this for the present, we will consider the more important questions presented by the defendant on the new assignment, or amendment, of the petition, and they are, the validity of the election held in the third and fourth wards of the city of Alton, and the legality of the votes of the students of Shurtleff College, who voted at the precinct in Upper Alton.

It appears, from the record, the city of Alton was one election precinct, established as such, by order of the county court, in 1847, and by another order, passed in 1861, the place of holding elections therein was fixed at the city buildings. Afterwards, two sets of judges were selected in this precinct, and, in September, 1870, it was ordered that the poll of the third and fourth wards should be held at the engine-house. By an order of court, at the October term, 1870, the place of voting in these wards was changed from the engine-house to Fuch's or Fox's store, on Second street.

It appears when the judges and voters appeared at Fuch's store on the day of this election, the proprietor forbid them the use of it. They then repaired to Athelem's barber shop, on the same side of Second street, and not more than fifty or one hundred feet distant from Fuch's store, and there the poll was regularly opened, and the election proceeded without hindrance, all the voters knowing where the poll was opened, as it was readily seen from Fuch's store, and made manifest by the crowd going and returning therefrom.

No fraud or improper motive is charged by appellee to

produce this change, and no voter complains that he was deprived thereby of an opportunity to vote. It seems to have been deemed necessary by the judges and voters, on being deprived the use of the store, that some other convenient place should be provided for the poll, and, rather than deprive three hundred and ninety-two voters of their privilege, we are disposed to hold there was no wrong done in holding the election at the barber's shop.

Upon the other point, the right of students at Shurtleff College to vote, this must be determined by the statute. Section 65 of chapter 46, title, " Elections," under the head, " Qualification of Voters," provides as follows : " Every person having resided in this State one year, in the county ninety days and in the election district thirty days next preceding any election therein, who was an elector in this State on the first day of April, in the year of our Lord 1848, or obtained a certificate of naturalization, before any court of record in this State, prior to the first day of January, in the year of our Lord 1870, or who shall be a male citizen of the United States above the age of twenty-one years, shall be entitled to vote at such election." By section 66, it is declared, a permanent abode is necessary to constitute a residence, within the meaning of the preceding section. R. S. 1874, p. 460.

The question turns upon what is a permanent abode, and this must be determined by facts and intention.

The legislature, by this section, sought to establish a criterion of residence, by declaring that a permanent abode shall be such criterion. Now, what is " a permanent abode ? " Must it be held to be an abode which the party does not intend to abandon at any future time? This, it seems to us, would be a definition too stringent for a country whose people and characteristics are ever on a change. No man in active life, in this State, can say, wherever he may be placed, this is and ever shall be my permanent abode. It would be safe to say a permanent abode, in the sense of the statute, means

nothing more than a domicil; a home, which the party is at liberty to leave, as interest or whim may dictate, but without any present intention to change it.

One who has a home in a town in this State is, by the laws of the State, liable to town duties, to be taxed on his personal property, to be enrolled in the militia, and placed on the jury lists and serve as juryman, and to be chosen to fill town or county offices, if of mature age and possessed of other proper qualifications, and he is entitled to all the privileges of the town, and to receive its support in the event of his becoming a pauper.

These students were undergraduates of Shurtleff College, subject to its rules and regulations, and, so far as the testimony shows, taking no part in town affairs, and paying no taxes, and not assessed on their personal property for taxation to aid in defraying the expenses of the town. Some of them paid a road tax in their own labor, the street commissioner demanding this, on the basis of a residence of ten days. The homes of some of them are in distant States, who have nothing to attach them to the town in which the college is situate. Others, who testify they are entirely free from parental control, and regard Upper Alton as their home, having no other to which to return in case of sickness or domestic affliction, are unquestionably as much entitled to vote as any other resident of the town, pursuing his usual avocation. It is, *pro hac vice*, the home of such students—their permanent abode, in the sense of the statute, as clearly so as that of any other resident. As a general fact, however, undergraduates of colleges are no more identified with residents of the town in which they are pursuing their studies, than the merest strangers, and should all the seats of learning in the United States be polled, not more than one student in twenty would be found to possess the proper qualification of a resident of the town.

Particularizing students who, we think, were not entitled to vote, not having a permanent abode in Upper Alton, the

place of their voting, we name, A. H. Post, G. W. Peters, J. W. Primm, I. D. Badger, S. E. Tyson, B. F. Simpson, E. E. Tyson, T. M. Stewart, H. W. Tate, E. T. Cassell, T. C. Coffee and J. F. Howard, in all twelve, who voted for appellee, and were not qualified voters, and their votes should not have been counted for him.

It is urged, as some of these students, Cassell, E. E. and S. E. Tyson, paid a road tax in labor, this should weigh in determining the question of residence. By the statute in force when this road labor was performed, residence was not a qualification, but simply inhabitancy. All inhabitants of the road district, between the ages of twenty-one and fifty, were required to perform road labor. This was not a tax, as this court held in *Town of Pleasant* v. *Kost,* 29 Ill. 490, and *Fox* v. *City of Rockford,* 38 ib. 451, and is not an element to be taken into the account, to determine the question of residence, as required by the statute.

There remains the question of the jurisdiction of county courts to grant certificates of naturalization to aliens. Of this we have no doubt. The act of Congress does not require that the court of record shall have a general common law jurisdiction, but only common law jurisdiction, a seal and a clerk. This the county courts had at the time the cases in question arose.

Reference is made to *Knox County* v. *Davis et al.* 63 Ill. 407, in which it was held county courts had not such jurisdiction. Further reflection and more mature consideration have satisfied us the views there presented on this question are not in harmony with the decisions of other courts on the same question, and the doctrine thereof is overruled. *The People* v. *McGowan,* 77 Ill. 644.

As to the votes of the paupers cast at the Edwardsville precinct, it is sufficient to say they are not claimed by appellant, save one, only, Richard Crayse. He was an inmate of the poor house at the time he voted, but the proof is sufficient to show that, previous to his becoming so, his residence

was Edwardsville, and this he did not forfeit by becoming a county charge.

We have now disposed of all the controverted points in the case. What remains is mere matter of compilation. It is very apparent appellant made out his case in his original statement of points, and the only inquiry is, is the result changed by any matter presented by appellee, considered in connection with the amendments to the petition? Having made out his case against appellee in the first instance, appellant should have had the judgment of the court in his favor. The ballots given to appellant at New Douglas, Silver Creek, Marine, Madison and Collinsville, and thrown out by the judges because they were folded each with another ballot not numbered, and which was for appellant also, and counting one less for appellee at Bethalto precinct, and which he admits should be done, the state of the polls showed a clear majority for appellant, 2096 against 2092 for appellee.

The real questions are, under the principles we have announced, how many of these 2096 votes, cast for appellant, are illegal, and how many of the 2092 cast for appellee are in the same category. But first, there must be added to appellee's score, one vote at Omphghent, and one at Troy precinct, and one at Venice, the vote of Black; the first two for the same reason, that the votes were numbered and cast out because they were folded each with a ballot not numbered; and the latter, because the proof shows he was a registered voter at Venice precinct, had voted unchallenged, and his ballot afterwards taken from the box by the judges and not counted for the appellee. The poll would then stand, 2096 for appellant, 2095 for appellee.

Now as to the illegal votes. Appellee challenges forty-seven, viz: ten in Collinsville precinct, ten in Edwardsville precinct, six in New Douglas precinct, one in Troy and one in St. Jacob's precinct, six in Omphghent precinct, two in the Foster precinct, one in Greenwood and one in Monticello precinct, two in Venice precinct, one at Alton precinct, two at

Alhambra precinct, one at Highland, two at Worden and one at Marine precinct. Their names are given.

Of those challenged at Collinsville, two of them, namely, Coombe and Hewitt, voted for appellee, and the same is the case of Poos, in Worden precinct. Rourke testified his residence was Collinsville, and had resided there since March, 1871. He had a family there from that time on; went to Abbeyville, in St. Clair county, for the winter, with the intention of returning to Collinsville; remained at Abbeyville two or three months, with his family, considering it as his residence, until the house in which he was living burned down; he then returned to Collinsville January 29, 1874.

It can hardly be maintained this man was a resident of Madison county ninety days before the election, and was a legal voter. This challenge should be allowed. William C. Hadley was properly challenged. His residence was Jackson county. He changed it to Madison county, but not ninety days before the election. This challenge must be allowed. We fail to perceive any ground of challenge of the others.

Of those challenged at Edwardsville, it is admitted that Collins, Shay, Dolt and Young were not residents of the precinct, and the last named was not a citizen of the United States, nor within any of the saving provisions of the constitution. We perceive no objection to the remaining five.

Of those challenged at New Douglas precinct, one of them, Brown, voted for appellee. It is claimed, as the others voted without having been registered, and without any proof of right, their votes are invalid. It does not appear these voters were challenged, or any objections made to their voting, and the presumption must be they were legal voters, and so known to the judges of the election.

Reeder, challenged at Troy precinct, was a legal voter. The evidence fully satisfies us on that point. We perceive no objection to David Waters, who voted at St. Jacobs.

Of those challenged as voting at the precinct of Omphghent, we perceive no objection to any of them, unless it be to the right

of Henry Ruckle. His case is a peculiar one, and though he may be illegitimate, he came to this country as a member of John Ruckle's family, whose wife was his mother, and who was naturalized whilst Henry was an infant. John Ruckle is his reputed father, and the husband of his mother. We are inclined to hold, as he was a member of his reputed father's family when his father was naturalized, and he an infant, that, by virtue of the act of Congress, he became naturalized. The real paternity of reputed children of naturalized persons is hardly a fit subject for judicial investigation in a controversy of this nature. Of the other persons challenged, they were naturalized by the county court, and thus became citizens of the United States.

Of those challenged at the other precincts named, we find nothing to disqualify them. There may be some doubt as to the qualification of Charles, but in view of his mother's testimony, we are inclined to hold he was a qualified voter.

Six votes must be deducted from appellant's total, leaving him 2090 votes, against 2095 for appellee.

But appellant insists that, at Edwardsville precinct, two votes were given to appellee by resident voters of Bethalto precinct, namely, John W. Buckley and Gotlieb Schmidt. We have remarked on these cases, and are satisfied they were not legal voters at the Edwardsville precinct, and that they did not exercise the franchise innocently, as the boundary between the Edwardsville and Bethalto precincts is marked for some distance by a water course known as Indian creek. The act of voting out of the proper precinct was a violation of law, and no profit should be derived from it to the party voting, or to any one else. These votes deducted from appellee's total leaves him 2093, from which is to be deducted the votes of twelve students above named, of Shurtleff College, voting at the precinct of Upper Alton. This would give to appellee 2081, against 2090, to which appellant is fairly entitled.

There are ten other votes challenged by appellant as illegal, and cast for appellee, four of them, namely, Frank Neider-

corn, Russell Wilson, John Forsyth and James Kimel, voted at Bethalto precinct. The first named was a resident in the precinct of Upper Alton, where alone he had a right to vote, and Wilson, the proof shows, had not resided in the county ninety days next preceding the election, both violating the law knowingly. The others—James Kimel was a Swede; came to this country when twenty-five years of age, and had not been naturalized; John Forsyth was a native of Scotland, and emigrated to this country in 1870, then about twenty-five years of age, and has never been naturalized, as he himself testifies. Herman Astenmier, who voted at the Collinsville precinct for appellee, was, at the time of the election, a resident of Edwardsville precinct, and therefore not qualified to vote at Collinsville. So with regard to Charles Hinrich, who voted at Troy precinct for appellee, being, at the time, a resident of Marine precinct. These votes, taken from appellee's total, leave to him 2075 votes, against appellant's 2090, as above shown. There are other votes challenged by appellant as illegal. L. G. Bigwood is one. He had removed to Arkansas, doing business there for more than two years. We are inclined to hold he did not become a voter on his return, not being a resident of the State one year next preceding the election. G. A. Engelman is shown not to have been naturalized. He was a native of the Kingdom of Hanover, coming to the United States, with his father, in 1845, and to this State in 1867. His father was not naturalized, nor was this man, as appears by his own admission. James Demick, who voted for appellee at Monticello precinct, was, at the time, a resident of Upper Alton precinct. His vote should not count. George Bartlet was not entitled to vote at Venice precinct, being a resident of Edwardsville precinct. As to J. Milton Edwards, who voted at Monticello for appellee, the weight of the testimony is, he had no residence there, nor in this State, but was a resident of Wisconsin. Here are five votes counted for appellee to which he is not entitled, which, deducted from his total as above, 2075, leaves

to him but 2070 votes to which he has a legal claim.   Deducting this total from 2090, which appellant can fairly claim, there is shown to be a balance in his favor of twenty votes, which entitles him to the certificate of election.

After a careful examination of the record, and a full consideration of the arguments, the above is the conclusion we have reached.

To recapitulate, appellant is entitled to claim 2090 votes as legally cast for him by qualified voters of the county. Appellee is entitled to claim 2070 votes, as legally cast for him by qualified voters.   The difference, twenty, is the major-ity appellant can rightfully claim over the appellee, and to him should the certificate of election be granted.

The court, in deciding the certificate should be granted to appellee, and that he was duly elected, and in dismissing appellant's bill at his costs, erred, and for the error the judgment must be reversed, and the appellant must be declared duly elected to the office of county judge, and it is so ordered and declared.

*Judgment reversed.*