THE PEOPLE *ex rel.* Charles Agnew, Plaintiff in Error, *vs.* EDWARD GRAHAM *et al.* Defendants in Error.

*Opinion filed April 22, 1915.*

1. ELECTIONS—*ward lines must not be crossed in fixing election districts.* In fixing the boundaries of election districts in a city ward lines must not be crossed, although a ward may be divided into several election districts or precincts, in which case the voter must have resided in the precinct thirty days before the election. (*Welsh* v. *Shumway,* 232 Ill. 54, followed.)

2. SAME—*when fact that voting place is not in the ward does not invalidate election.* The fact that a city, divided into three wards, had but one polling place for city elections, which was located just across the street from the boundary lines of two of the wards, does not invalidate the election on the ground that the voters in two of the wards had to cast their ballots outside the boundaries of such ward, where such custom has been followed in such city for years and it is not shown that any injury to anyone has resulted therefrom.

3. SAME—*when place of residence of judges does not invalidate election.* Where a city has but one polling place for a city election, the fact that all three of the judges do not reside in the precinct where the polling place is located does not invalidate the election.

COOKE, J., dissenting.

WRIT OF ERROR to the Appellate Court for the Second District;—heard in that court on writ of error to the Circuit Court of LaSalle county; the Hon. JOE A. DAVIS, Judge, presiding.

L. B. Olmstead, and Butters & Clark, (George S. Wiley, State's Attorney, of counsel,) for plaintiff in error.

Faissler, Fulton & Roberts, and Browne & Wiley, for defendants in error.

Mr. Justice Carter delivered the opinion of the court:

This proceeding was commenced in the circuit court of LaSalle county October 4, 1912, by the State's attorney filing with leave of court, in the name of the People, on the relation of Charles Agnew, an information against Edward Graham, F. E. Blakeslee and P. J. Cruise, requiring them to show by what warrant they respectively exercised the offices of mayor of Earlville and aldermen of said city and the offices of president and secretary and member of the board of local improvements of said city, which offices, the information alleged, they had and still usurped. Respondents set up, by plea, their title to their respective offices. A demurrer thereto having been overruled, plaintiff in error elected to abide thereby and judgment was entered in favor of respondents. A writ of error was sued out from the Appellate Court for the Second District, and that court affirmed the judgment. The case has been brought to this court by petition for *certiorari.*

From the petition and plea it appears that the city of Earlville was organized under the general City and Village act on February 5, 1887, and about two months thereafter, by ordinance, it was divided into three wards, the boundaries of which it is unnecessary to state here. The same day an ordinance was passed providing that the city council should appoint three judges of election, one from each of the three wards, and one or more clerks, who should conduct all the city elections until their successors were selected; that the elections in said city should be held at a place therein to be designated by the city council in a notice published by the city clerk twenty days before the election;

that a ballot-box should be prepared with three compartments, lettered "First Ward," "Second Ward" and "Third Ward," respectively, and that each voter's ballot be deposited in the compartment designated for the ward in which he resided, otherwise such ballot should not be counted for alderman. It further appears that the said last mentioned ordinance remained in full force from 1887 to the time of the hearing of this cause and had never been repealed or amended, and that said city of Earlville had conducted and held all elections from and after its organization in conformity with said ordinance. From the plea it further appears that in the spring of 1911 a primary, and thereafter an election, were duly called, due notice thereof given and the same duly held, and that the respondents became candidates for the respective offices and all necessary steps were taken to place their names on the primary ballot and on the official ballot in the election; that they were fully qualified in every respect to be candidates and to hold the said offices, and that they were each duly nominated and elected, Graham for mayor and Cruise and Blakeslee for aldermen of the first and second wards, respectively, and that the election was held according to law and the returns canvassed and declared, and they duly qualified and entered upon said offices, and thereby, under the law, became members of the board of local improvements and were at the time of filing said plea occupying said offices; that said primary and said election of 1911 were held at the city hall in the city of Earlville, which was the place designated by the city council and had been the place of holding elections in said city for twenty years last past; that the ballot-box contained three compartments, and that all those voting at the election were legally qualified voters in the ward designated on the compartment in which their ballots were deposited and that each judge of election possessed the qualifications required by law. The plea further alleged "that there was a large vote cast at said election and a fair ex-

pression of the will of the voters of said city; that no one entitled to vote was deprived of his right to do so by reason of the polling place being situated as aforesaid, and that the said election was conducted in all respects in the same manner as has been the custom and practice in said city for more than twenty years and as provided for by the general ordinances of said city; that said city hall is centrally and conveniently located for holding such elections," etc.   It further appears from the plea that the city hall was located not more than sixty feet distant from the boundary lines of both the first and second wards of said city, being located in the southeast corner of the third ward, directly north of Winthrop street, the northern boundary of the first ward, and directly west of Ottawa street, the western boundary of the second ward.

The first question necessary to be considered is whether the ward lines must be taken into consideration in fixing the boundaries of the precinct or voting district.   The words "precinct" and "district" are frequently used interchangeably and with the same meaning in the various statutes of this State.   (*People* v. *Markiewicz,* 225 Ill. 563.) Section 3 of article 4 of the Cities and Villages act provides that "all persons entitled to vote at any general election for State officers within any city or village, having resided therein thirty days next preceding thereto, may vote at any election for city or village officers."   (Hurd's Stat. 1913, p. 268.)   If this were the only provision of the law affecting residence and election districts there would be no question, as contended by counsel for defendants in error, that a city, even though divided into wards, could be considered as one election district.   Section 4, however, of said article 4 of the Cities and Villages act, provides, among other things, that the city council may divide the city into wards, and that one alderman shall annually be elected from each ward.   Section 9 provides that the city council shall designate the place or places in which the

election should be held and appoint the judges and clerks, and cause notices to be printed and posted as to the time and place of election twenty days before such election. Section 10 provides that the manner of conducting elections and voting at elections held under this act and contesting the same shall be "the same, as nearly as may be, as in the case of the election of county officers, under the general laws of this State." Section 1 of article 7 of the constitution of 1870 provides that "every person having resided in this State one year, in the county ninety days, and in the election district thirty days next preceding any election therein, * * * shall be entitled to vote at such election." Section 65 of the general Election law follows this wording of the constitution as to the residence of the voter in State, county and election district. (Hurd's Stat. 1913, p. 1055.)

This court had under consideration a somewhat similar question in *Welsh* v. *Shumway*, 232 Ill. 54, and held that for city elections the city council, and not the county board, should establish the boundaries of the election precincts or districts, as well as name the polling places and the judges and clerks of election, but that in such cities, for city elections, (p. 67,) "the ward lines must necessarily be considered in forming election districts." As a practical matter in carrying on and conducting a city election where the city is divided into wards, we do not see how it can be reasonably argued that the ward lines can be ignored in forming and fixing the boundaries of election districts or precincts, otherwise it would be impossible to elect the aldermen. That this must be so is conceded by counsel for defendants in error, but they argue that under the holding of this court in *People* v. *Markiewicz, supra,* the city may be considered one election precinct with a separate polling place in each ward, it being held in the case just referred to that for the purpose of town elections the entire town was considered as one voting precinct as respecting the qualifications of the

voters although there might be several polling places in the town. The wording of the statutes as to the conduct of town elections is, as will be seen from the two cases already cited, very different from the wording of the statutes on city elections. The reasoning of the case last referred to as to the conduct of township elections does not apply to the fixing of boundaries of election districts for city elections and the manner of conducting such elections. We see no reason to change the holding in *Welsh* v. *Shumway, supra,* that under the law in this State the ward lines must not be crossed in forming the boundary lines of an election district though such ward may be divided into several election districts or precincts, in which case the voter must have resided in the precinct thirty days before the election, in conformity with the constitution and as required by said section 65 of the general Election law.

The principal contention in the briefs is whether the voters of the first and second wards could legally cast their ballots outside of the boundaries of the respective wards in which they resided. This precise question has never been considered or decided in this State although general statements have been made in various decisions which have more or less bearing thereon. In several other jurisdictions the question has been decided, but those decisions can not be controlling here, except in so far as the reasoning in those cases is in accord with the general principles of our constitution and statutes as construed by this court. A brief review of these principles as set out in some of the numerous decisions in this State bearing on election matters will assist in reaching a correct conclusion on the question now before us.

In *People* v. *Kilduff,* 15 Ill. 493, the court held that the legality of an election did not depend upon the declaration of the board of elections, as required by law; that the authority, rights and powers of elected officers were derived from the election and not from the returns.

In *Piatt* v. *People*, 29 Ill. 54, where the law required that the polls should be closed at five o'clock and they were kept open after that hour, it was held that the election would not be declared void on that ground unless it was made to appear that votes were cast after that hour which would change the result; that a mere irregularity in conducting an election which deprived no legal voter of his rights and did not change the result "never has been held to invalidate an election."

In *People* v. *Hilliard*, 29 Ill. 413, it appeared that the judges of election were not properly sworn. The canvassing board on that account refused to canvass the returns. This court held that it was the plain duty of the board to do so, and said (p. 425) : "The question in all such cases should be, whom did a majority of the qualified voters elect? * * * A literal compliance with prescribed forms is not required in any case if the spirit of the law is not violated."

In *People* v. *Logan County*, 63 Ill. 374, it was held that the carelessness or fraud of the judges in not using the registry list as required by law could not be held to deprive the electors of the privileges reserved to them by the constitution and did not invalidate the election.

In *DuPage County* v. *People*, 65 Ill. 360, where the law stated positively that an adjournment or recess should not be taken at the noon hour by the judges and clerks of election, the court held that where such an adjournment was taken and no fraud or injury was shown on that account it was no ground for rejecting the entire poll of the township.

In *People* v. *Waite*, 70 Ill. 25, an election for school trustees was held at a place not designated in the notices. The relator, who sought to avoid the election for that reason, had participated therein by voting and running as a candidate, and it was held that sound public policy forbade him from having the election of his opponent declared void on that ground.

In *Cleland* v. *Porter,* 74 Ill. 76, the court held that if an election had in other respects been fairly and properly conducted it would not be declared invalid because the judges closed the polls an hour before the time prescribed by law, when it did not appear that any voter offered to vote after the polls were closed or was thereby prevented from voting.

In *Dale* v. *Irwin,* 78 Ill. 170, at an election held in Alton it was ordered that one of the polling places should be at Fuch's store. On the date of the election the proprietor of that store forbade the judges and clerks to use it. They therefore repaired to a barber shop on the same side of the street and not more than fifty or one hundred feet away, where the polls were opened, and the election proceeded at this latter place without hindrance, all the voters knowing where the polls were open, as the place was readily seen from Fuch's store. This change by the judges was held not to invalidate the election.

In *City of Chicago* v. *People,* 80 Ill. 496, where, after notice of election was given stating the places of holding an election to incorporate under the Cities and Villages act, a change was made necessary in several of the wards because the rooms in question could not be procured, and a resolution thereafter was passed by the council changing the places and publishing notice of such changes and the location of the new places before the election, it was held that such changes would not invalidate the election, the court saying (p. 505): "The place of holding an election would seem to be one of the least important of the things pertaining to the notice, especially when the place is not to be fixed by the notice but is fixed by public authority, as in this case, by the legislative body of the city.  *  *  *  It would not seem to subserve any important end that the voter should have previous notice, for any length of time, of the place of holding the election." This was held not to invalidate the election, even though notice of the time

267 - 28

and place of election was required by law to be given thirty days before and the change was within the thirty days.

In *Hodge* v. *Linn,* 100 Ill. 397, it was held that the failure to number the ballots cast at the election, as the law then required, and to count the votes in the manner required by statute and to string the ballots on thread or wire in the order of their reading, did not invalidate the election, where nothing appeared to show an injurious effect or that the votes were not truly counted.

In *Simons* v. *People,* 119 Ill. 617, a certain town was divided into two voting districts by the county board, as required by law for general elections, with a voting place in each. The trustees of schools fixed only one polling place in such town for a school election. In the election notice one polling place was described as at Kuhn's Hall, while the proper authorities had established a polling place at Kuhn's real estate office on election day and the last named place was used. The buildings were not more than two hundred feet apart, in plain sight, with an open space between them. The evidence showed that no one was prevented from voting by not knowing where the voting place was or on account of the place at which the votes were taken, and the election was held legal.

In *Behrensmeyer* v. *Kreitz,* 135 Ill. 591, the election officers, after the close of the polls in a certain precinct, took the ballots to a room up-stairs instead of counting them, as the statute required, where the election was held. This change, as the evidence disclosed, was not from any wrongful intent and did not deprive any legal voter of his right to vote or change the result of the election.

In *Ackerman* v. *Haenck,* 147 Ill. 514, the judges failed to make the proclamation thirty minutes before the polls closed and after the ballots were counted they were not delivered to the township treasurer, as the law required, and there were other irregularities of a similar character. The record did not show that the election officials were

actuated by improper motives or that the failure to follow the law changed the result, and the election was held legal.

In *People* v. *Brown*, 189 Ill. 619, the court decided that an election for school trustees held at the time of the regular election for town officers at the town meeting was not void because it did not appear that the place where the election was held had been designated, as the statute required, by the electors at their annual meeting. For at least fifteen years prior to 1895 the annual town meetings and elections were held in that township at a truck-house in the village of Roseville and seem to have been properly called under the statute. The truck-house became unfit for further use and the election of 1896 was held in the opera house, located on the same lot, in plain sight and within one hundred feet of the truck-house. No action was taken by the proper authorities as to changing from the truck-house to the opera house, but the elections had been held at the latter place for several years before the question was raised as to the legality.

In *Choisser* v. *York*, 211 Ill. 56, the testimony showed that on the morning of the election none of the regularly appointed judges appeared and other persons took their places without having been properly selected; that the polling place was established in a room in the court house not opening, as the law required, upon a public thoroughfare; that no register of voters was used, and that some thirty or thirty-five persons prepared ballots outside of the booths, which were counted by the judges. The court held that the election in this precinct was not invalid because the judges were not properly selected or because the polling place was not located upon a public thoroughfare, but held that under the Australian Ballot law the ballots must be marked by the voters in the booths, as required by the provisions of that act.

In *People* v. *Green*, 265 Ill. 39, in an election on the proposition to levy a tax for hard roads, it was contended

that the returns had not been canvassed by the proper officials. The court held that the fact that the returns had, under a misapprehension of the law, been canvassed by officials not designated by law as the canvassing board was not fatal to the tax, as the record showed that the majority of the people voting at the hard roads election were in favor of levying such tax.

· These cases serve to illustrate, as well as any decided by this court, the rulings that bear upon the question we are here passing upon. In none of them has the question now before us been squarely before the court, and those cases, therefore, cannot be controlling here. The courts, in discussing questions similar to this, have frequently considered the question as to whether statutes regulating elections were mandatory or directory. A mandatory provision in a statute is one the omission to follow which renders the proceeding to which it relates illegal and void, while a directory provision is one the observance of which is not necessary to the validity of the proceeding. Directory provisions are not intended by the legislature to be disregarded, but where the consequences of not obeying them in every particular are not prescribed the courts must judicially determine them. In doing so they must necessarily consider the importance of the punctilious observance of the provision in question to the object the legislature had in view. If it be essential it is mandatory. (2 Lewis' Sutherland on Stat. Const.—2d ed.—sec. 610.) No universal rule can be given to distinguish between directory and mandatory provisions. The controlling question in this as in all other rules of construction is, what was the intention of the legislature? Whether a statute is mandatory or directory does not depend upon its form but upon the legislative intention, to be ascertained from a consideration of the entire act, its nature, its object and the consequences which would result from construing it one way or the other. (36 Cyc. 1157, and cases cited.) In general,

statutes directing the mode of proceeding by public officers are deemed advisory, and strict compliance with their detailed provisions is not considered indispensable to the validity of acts done under them. (Endlich on Interpretation of Statutes, sec. 437.) The terms "mandatory" and "directory" may be convenient to distinguish one class of irregularities in election matters from the other. "But, strictly speaking, all provisions of such laws are mandatory in the sense that they impose the duty of obedience on those who come within its purview, but it does not therefore follow that every slight departure therefrom should taint the whole proceedings with a fatal blemish. Courts justly consider the chief purpose of such laws, namely, the obtaining of a fair election and an honest return, as paramount in importance to the minor requirements which prescribe the formal steps to reach that end." (Bowers v. Smith, 111 Mo. 45; 2 Lewis' Sutherland on Stat. Const.— 2d ed.—sec. 709.) The Supreme Court of one of our sister States has held that "all provisions of the Election law are mandatory if enforcement is sought before election in a direct proceeding for that purpose, but after election all should be held directory, only, in support of the result, unless of a character to affect an obstruction to the free and intelligent casting of the votes or to the ascertainment of the result, or unless the provisions affect an essential element of the election, or unless it is expressly declared by the statute that the particular act is essential to the validity of an election or that its omission shall render it void." Jones v. State, 153 Ind. 440; Norman v. State, 99 N. E. Rep. (Ind.) 812.

This court has stated in some of the decisions already cited, and in other cases, that "where a statute imposes duties upon officials connected with the holding of an election and by express language provides that the omission to perform the same shall render the election void, then all courts are bound to enforce such statute and pronounce the

election void, regardless of all considerations touching its policy or impolicy; 'but if, as in most cases, the statute simply provides that certain acts or things shall be done within a particular time or in a particular manner and does not declare that their performance is essential to the validity of the election, then they will be regarded as mandatory if they do, and directory if they do not, affect the actual merits of the election.' " (*People* v. *Crossley*, 261 Ill. 78; *Parker* v. *Orr*, 158 id. 609; *Blankinship* v. *Israel*, 132 id. 514.) We have also said that where a statute does not declare the performance of certain duties by public officials in connection with the election to be essential to the validity of the election, it will be regarded as mandatory if such matters affect the real merits, but will be considered directory, only, and not vital to the election, unless they are such, in themselves, as to change or render doubtful the result. *People* v. *Green, supra.*

"Election statutes are to be tested like other statutes, but with a leaning to liberality in view of the great public purposes which they accomplish; and except where they specifically provide that a thing shall be done in the manner indicated, and not otherwise, their provisions designed merely for the information and guidance of the officers must be regarded as directory, only, and the election will not be defeated by a failure to comply with them, providing the irregularity has not hindered any who were entitled from exercising the right of suffrage or rendered doubtful the evidence from which the result was to be declared." Cooley's Const. Lim. (7th ed.) sec. 928.

Neither the statute nor the constitution provides, in terms, that the votes shall be cast within the election district or precinct. The general rule is, that it is essential to the validity of an election that it be held at the time and in the place provided by law. (McCrary on Elections,—4th ed.—sec. 153; 1 Dillon on Mun. Corp.—5th ed.—sec. 370; Mechem on Public Officers, sec. 181; Cooley's Const.

Lim.—7th ed.—sec. 930; 2 McQuillin on Mun. Corp. sec. 414; 10 Am. & Eng. Ency. of Law,—2d ed.—sec. 684; 15 Cyc. 343.)    And this court, in discussing certain provisions as to the validity of the election, has laid down this same general rule.    (*Stephens* v. *People*, 89 Ill. 337; *Snowball* v. *People*, 147 id. 260.)    It is plain, however, from the decisions of this court heretofore cited, that it does not follow that the polls must be opened and the election conducted in the very building designated in the order and notice of election.    A slight change in the voting place will not render an election void where it appears that no legal voter was prevented from voting and that the change was not made from any improper motive.    Many of the cases, however, that discuss the question of a change in polling place had under consideration a change within the boundaries of the election precinct as fixed and not outside of those boundaries.    Some of the decisions relied on most strongly by counsel for plaintiff in error are of this nature, among others *Melvin's case*, 68 Pa. St. 333.    The polling place in that case was moved by the judges on the day of election three miles, but still in the same voting district, from the place where it had been established by the proper authority.    *Knowles* v. *Yeates*, 31 Cal. 82, is another case of the same character, where the polling place was moved about three miles on election day and located at another place in the same voting precinct.    In both of these cases the election, on that account, was held invalid.

The question of the polling place being located outside of the boundaries of the voting district was most seriously considered by various courts when, during the progress of our civil war, statutes were enacted permitting persons absent from their States, engaged in the military service of the United States, to vote.    The constitutionality of these statutes generally turned on whether it was competent for the State legislature to authorize a citizen to vote elsewhere than at the place of his residence.    (McCrary on

Elections,—4th ed.—sec. 153.) In the case of *Baldwin* v. *Trowbridge,* 2 Bartlett's Cont. Elec. Cas. 46, the United States house of representatives held the statute constitutional so far as it related to the election of members of Congress. The Supreme Court of California, in *Bourland* v. *Hildreth,* 26 Cal. 161, held that a statute of that State enabling voters in the military service of the United States to vote outside of their legal residences was unconstitutional. The same holding was made in *Chase* v. *Miller,* 41 Pa. St. 403. In recent years the legality of votes where the polling place has been located at a place convenient for the voters, by the proper officers, only a short distance outside of the election district, has been passed upon by the courts in several of the States. The courts of last resort in the majority of these cases have held that where it was shown that no legal voter was thereby deprived of his vote and the location was not selected from any improper motive, no fraud or other harm being shown or charged, such location of a polling place would not avoid the election. (*Lane* v. *Otis,* 68 N. J. L. 656; *People* v. *Carson,* 155 N. Y. 491; *Peard* v. *State,* 34 Neb. 372; *Murchie* v. *Clifford,* 79 Atl. Rep. (N. H.) 901; *Ex parte White,* 33 Tex. Crim. 594; *Davis* v. *State,* 75 Tex. 420; *Ex parte Stein,* 135 S. W. Rep. (Tex.) 136; *Wakefield* v. *Patterson,* 25 Kan. 495; *Steele* v. *Calhoun,* 61 Miss. 556. See, also, where the same rule is adhered to, *Delano* v. *Morgan,* 2 Bartlett's Cont. Elec. Cas. 168; 15 Cyc. 344.) With perhaps one or two exceptions in the cases cited by counsel for plaintiff in error as holding the contrary to the decisions just cited, the precise point here involved was not decided. In *State* v. *Fitzgerald,* 37 Minn. 26, the court decided an act of the legislature assuming to establish a second election district in an organized town unconstitutional, and that a town election held at what would then be the proper place in the town if the law were unconstitutional was valid. In *People* v. *Holihan,* 29 Mich. 116,

the public authorities attempted to change the boundaries of the voting districts, and the court held the action of the authorities in this regard illegal, and that the voters in the territory so changed should have voted at their old voting precinct and not at the new one in the changed district. This was in accord with the holding of this court, under similar circumstances, in *Rexroth* v. *Schein,* 206 Ill. 80. The point of this holding in this and other jurisdictions where the same conclusion has been reached is, that where there is a polling place in each of two adjoining districts and where the boundary line has been attempted to be changed without legal authority, the voters in the disputed strip cannot vote at the polling place of the district in which the public officials have attempted, without authority, to place them.

The requirement that the party offering to vote shall reside within the district which is to be affected by the exercise of his right has been adopted in most, if not all, jurisdictions to enable persons residing in the neighborhood where the voter resides to become acquainted with him and know that he is a *bona fide* resident not only of the State and county but of the district where he attempts to vote. By requiring him to vote among his neighbors who know whether he is legally entitled to vote, the opportunities for illegal or fraudulent voting will not be as great as if the voting were all to take place at a distance and among strangers. (Cooley's Const. Lim.—7th ed.—sec. 903.) Questions affecting the fairness of elections are of vital importance in this country. Popular self-government depends upon their proper solution. The late Justice Brewer, in discussing these questions in an opinion, said: "The problem is to secure, first, to the voter a free, untrammeled vote; and secondly, a correct record and return of the vote. It is mainly with reference to these two results that the rules for conducting elections are prescribed by the legislative power. But these rules are only means. The end is

the freedom and purity of the election. To hold these rules all mandatory and essential to a valid election is to subordinate substance to form,—the end to the means. Yet, on the other hand, to permit a total neglect of all the requirements of the statute and still sustain the proceedings is to forego the lessons of experience and invite a disregard of all those provisions which the wisdom of years has found conducive to the purity of the ballot-box. Ignorance, inadvertence, mistake, or even intentional wrong, on the part of local officials should not be permitted to disfranchise a district. Yet rules,—uniformity of procedure,—are as essential to secure truth and exactness in elections as in anything else. Irregularities invite and conceal fraud." (*Gilleland* v. *Schuyler,* 9 Kan. 387.) The fact that all the voters of a ward, by ordinance, vote at a polling place just across the street from the ward in which they live is not such an irregularity as would, merely by reason of such location, give increased opportunity for fraud in the election. Under our constitution the legislature has the authority to regulate the formation of voting districts or precincts. This is frequently, if not generally, delegated in this and other States to the local officials. These authorities draw boundary lines between the voting districts, and can change them, within certain limitations, if they desire. All that the constitution of 1870 in terms requires as to the place of voting is that the elector must vote at the polling place designated by law as the place for casting the vote of the district in which he resides. Of course, it is essential, to properly safeguard an election, that it be held at the time and place duly established as provided by law, but so far as we are advised there has been in all jurisdictions one exception to this general rule: that is, where the voting was done at the same place for years, the people supposing it to be the true place, though, in fact, it was different from the place that was provided by law or should have been fixed in accordance with law. (10 Am. & Eng. Ency.

of Law,—2d ed.—685, and cases cited; *Ex parte White, supra; Delano* v. *Morgan, supra.*) This, in effect, is the holding ·of this court in *People* v. *Brown, supra,* and although in that case the polling place was within the boundary lines of the voting district, upon principle we cannot see how the holding of the election within or without the boundaries of the voting precinct under such circumstances, and long acquiesced in by the voters, would make any difference in the legality of the votes cast at such polling place. In an unbroken line of decisions this court has held that while the legal safeguards which are thrown about the ballot must be faithfully observed by those who have been entrusted with their enforcement, yet under the pretense of enforcing them the will of the people should not be defeated by an honest mistake of election officials; that the literal compliance with prescribed forms will not be required if the spirit of the law is not violated; that forms should be subservient to substance when no legal voter has been deprived of his vote and no harm or injury of any kind has been done to anyone. *People* v. *Hilliard, supra; Dale* v. *Irwin, supra; People* v. *Ruyle,* 91 Ill. 525; *People* v. *Nordheim,* 99 id. 553; *Hodge* v. *Linn, supra; Ackerman* v. *Haenck, supra; Parker* v. *Orr, supra; Schuler* v. *Hogan,* 168 Ill. 369; *People* v. *Crossley, supra; Choisser* v. *York, supra; People* v. *Green, supra.*

The fixing by a public order of the polling place at a convenient point and giving public notice that such place has been located is for the purpose of giving proper information, in due time, to each voter in the district as to the place where the election will be held. All of this was accomplished by the location of the polling place here in question, as notice was duly given and everyone knew where the polling place was located. To hold that this election was invalid on account of the location of the polling place could be justified only on the ground either that the law was mandatory in requiring that the polling place be

located within the boundaries of the voting district, or that to hold the election valid would be laying down a rule of law that would tend strongly to overthrow the safe conduct of elections. As heretofore stated, neither our constitution nor statute in terms states that the polling place must be within the district. Both state only that each voting district or precinct must have a polling place and ballot-box for that district. Without doubt, the spirit of our Election law is that each polling place should be within the boundaries of the district for which it is chosen. Under the circumstances shown in this record, however, to hold that this election was invalid because the polling places for two wards were out of the respective wards would be to defeat the will of the voters of those wards, fairly and honestly expressed. Where no injury has been done to anyone by the mistake and where no benefit will redound to the public by holding otherwise, we cannot see how the safety and security of the ballot are in any way endangered by holding, under the restrictions and conditions laid down in this opinion, that this election, under the circumstances as here shown, is valid.

On principle and authority the trial and Appellate Courts rightly held that the election in question was not invalid because of the location of the polling place.

The question raised by counsel for plaintiff in error that the election was invalid because all three of the judges did not reside in the precinct where the ballots were cast is without merit. The authorities hold that these men were judges *de facto* and that the election was not void by reason of their acting as such. *Choisser* v. *York, supra;* Mechem on Public Officers, sec. 184.

The judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*

Mr. Justice Cooke, dissenting.